# DALIA v. UNITED STATES

No. 77–1722.   Argued January 9, 10, 1979—Decided April 18, 1979

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined and in Parts I and II

of which BRENNAN and STEWART, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which STEWART, J., joined except as to Part I, *post*, p. 259. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MARSHALL, JJ., joined, *post*, p. 262.

*Louis Ruprecht* argued the cause and filed a brief for petitioner.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the brief were *Solicitor General McCree, Assistant Attorney General Heymann, William C. Bryson, Kenneth S. Geller,* and *Jerome M. Feit.*

MR. JUSTICE POWELL delivered the opinion of the Court.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), 18 U. S. C. §§ 2510–2520, permits courts to authorize electronic surveillance[1] by Government officers in specified situations. We took this case by writ of

---

[1] All types of electronic surveillance have the same purpose and effect: the secret interception of communications. As the Court set forth in *Berger* v. *New York,* 388 U. S. 41, 45–47 (1967), however, this surveillance is performed in two quite different ways. Some surveillance is performed by "wiretapping," which is confined to the interception of communication by telephone and telegraph and generally may be performed from outside the premises to be monitored. For a detailed description, see Note, Minimization of Wire Interception: Presearch Guidelines and Postsearch Remedies, 26 Stan. L. Rev. 1411, 1414 n. 18 (1974). At issue in the present case is the form of surveillance commonly known as "bugging," which includes the interception of all oral communication in a given location. Unlike wiretapping, this interception typically is accomplished by installation of a small microphone in the room to be bugged and transmission to some nearby receiver. See McNamara, The Problem of Surreptitious Entry to Effectuate Electronic Eavesdrops: How Do You Proceed After the Court Says "Yes"?, 15 Am. Crim. L. Rev. 1, 2 (1977); Blakey, Aspects of the Evidence Gathering Process in Organized Crime Cases: A Preliminary Analysis, reprinted in the President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime, App. C, 92, 97 (1967). Both wiretapping and bugging are regulated under Title III. See 18 U. S. C. §§ 2510 (1) and (2).

certiorari to resolve two questions concerning the implementation of Title III surveillance orders. 439 U. S. 817. First, may courts authorize electronic surveillance that requires covert entry[2] into private premises for installation of the necessary equipment? Second, must authorization for such surveillance include a specific statement by the court that it approves of the covert entry?[3]

## I

On March 14, 1973, Justice Department officials applied to the United States District Court for the District of New Jersey, seeking authorization under 18 U. S. C. § 2518 to intercept telephone conversations on two telephones in petitioner's business office. After examining the affidavits submitted in support of the Government's request, the District Court authorized the wiretap for a period of 20 days or until the purpose of the interception was achieved, whichever came first. The court found probable cause to believe that petitioner was a member of a conspiracy the purpose of which was to steal goods being shipped in interstate commerce in violation of 18 U. S. C. § 659. Moreover, the court found reason to believe that petitioner's business telephones were being used to further this conspiracy and that means of investigating the conspiracy

---

[2] Every electronic surveillance necessarily is "covert" in the sense that it must be "hidden; secret; disguised" to be effective. Webster's New International Dictionary 613 (2d ed. 1953). As used here, "covert entry" refers to the physical entry by a law enforcement officer into private premises without the owner's permission or knowledge in order to install bugging equipment. Generally, such an entry will require a breaking and entering. See discussion *infra*, at 253–254.

[3] The Federal Courts of Appeals have given conflicting answers to these questions. See *United States* v. *Finazzo*, 583 F. 2d 837 (CA6 1978); *United States* v. *Santora*, 583 F. 2d 453 (CA9 1978); *United States* v. *Scafidi*, 564 F. 2d 633 (CA2 1977), cert. denied, 436 U. S. 903 (1978); *United States* v. *Ford*, 180 U. S. App. D. C. 1, 553 F. 2d 146 (1977); *United States* v. *Agrusa*, 541 F. 2d 690 (CA8 1976), cert. denied, 429 U. S. 1045 (1977).

other than electronic surveillance would be unlikely to succeed and would be dangerous. The wiretap order carefully enumerated the telephones to be affected and the types of conversations to be intercepted. Finally, the court ordered the officials in charge of the interceptions to take all reasonable precautions "to minimize the interception of communications not otherwise subject to interception," and required the officials to make periodic progress reports.

At the end of the 20-day period covered by the March 14 court order, the Government requested an extension of the wiretap authorization. In addition, the Government for the first time asked the court to allow it to intercept all oral communications taking place in petitioner's office, including those not involving the telephone. On April 5, 1973, the court granted the Government's second request. Its order concerning the wiretap of petitioner's telephones closely tracked the March 14 order. Finding reasonable cause to believe that petitioner's office was being used by petitioner and others in connection with the alleged conspiracy, the court also authorized, for a maximum period of 20 days, the interception of all oral communications concerning the conspiracy at "the business office of Larry Dalia, consisting of an enclosed room, approximately fifteen (15) by eighteen (18) feet in dimension, and situated in the northwesterly corner of a one-story building housing Wrap-O-Matic Machinery Company, Ltd., and Precise Packaging, and located at 1105 West St. George Avenue, Linden, New Jersey." The order included protective provisions similar to those in the March 14 wiretapping order.[4] The electronic surveillance order of April 5 was extended by court order on April 27, 1973.

---

[4] In relevant part, the Title III order of April 5 provided:

"[T]he Court finds:

"(a) There is probable cause to believe that Larry Dalia and others as yet unknown, have committed and are committing offenses involving theft from interstate shipments, in violation of Title 18, United States Code,

On November 6, 1975, petitioner was indicted in a five-count indictment charging that he had been involved in a

Section 659; sale or receipt of stolen goods, in violation of Title 18, United States Code, Section 2315; and interference with commerce by threats or violence, in violation of Title 18, United States Code, Section 1951; and are conspiring to commit such offenses in violation of Section 371 of Title 18, United States Code.

"(b) There is probable cause to believe that particular wire and oral communications concerning these offenses will be obtained through these interceptions, authorization for which is herewith applied. In particular, these wire and oral communications will concern the theft or robbery of goods moving in interstate commerce, and the transportation, sale, receipt, storage, or distribution of these stolen goods, and the participants in the commission of said offenses.

"(c) Normal investigative procedures reasonably appear to be unlikely to succeed and are too dangerous to be used.

.        .        .        .        .

"(e) There is probable cause to believe that the business office of Larry Dalia, consisting of an enclosed room, approximately fifteen (15) by eighteen (18) feet in dimension, and situated in the northwesterly corner of a one-story building housing Wrap-O-Matic Machinery Company, Ltd., and Precise Packaging, and located at 1105 West St. George Avenue, Linden, New Jersey, has been used, and is being used by Larry Dalia and others as yet unknown in connection with the commission of the above-described offenses.

"WHEREFORE, it is hereby ordered that:

"Special Agents of the Federal Bureau of Investigation, United States Department of Justice, are authorized . . . to:

.        .        .        .        .

"(b) Intercept oral communications of Larry Dalia, and others as yet unknown, concerning the above-described offenses at the business office of Larry Dalia, consisting of an enclosed room, approximately fifteen (15) by eighteen (18) feet in dimension, and situated in the northwesterly corner of a one-story building housing Wrap-O-Matic Machinery Company, Ltd., and Precise Packaging, and located at 1105 West St. George Avenue, Linden, New Jersey.

"(c) Such interceptions shall not automatically terminate when the type of communication described above in paragraphs (a) and (b) have first been obtained, but shall continue until communications are intercepted which reveal the manner in which Larry Dalia and others as yet unknown

conspiracy to steal an interstate shipment of fabric.[5] At trial, the Government introduced evidence showing that petitioner had been approached in March 1973 and asked to store in his New Jersey warehouse "a load of merchandise." Although petitioner declined the request, he directed the requesting party to Higgins, an associate, with whom he agreed to share the $1,500 storage fee that was offered. The merchandise stored under this contract proved to be a tractor-trailer full of fabric worth $250,000 that three men stole on April 3, 1973, and transported to Higgins' warehouse. Two days after the theft, FBI agents arrested Higgins and the individuals involved in the robbery.

The Government introduced into evidence at petitioner's trial various conversations intercepted pursuant to the court

participate in theft from interstate shipments; sale or receipt of stolen goods; and interference with commerce by threats or violence; and which reveal the identities of his confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of twenty (20) days from the date of this Order, whichever is earlier.

.        .        .        .        .

"PROVIDING THAT, this authorization to intercept oral and wire communications shall be executed as soon as practicable after signing of this Order and shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under Chapter 119 of Title 18 of the United States Code, and must terminate upon attainment of the authorized objective, [or] in any event, at the end of twenty (20) days from the date of this Order.

"PROVIDING ALSO, that Special Attorney James M. Deichert shall provide the Court with a report on the fifth, tenth, and fifteenth day following the date of this Order showing what progress has been made toward achievement of the authorized objective and the need for continued interception."

[5] Count one charged petitioner and others with conspiring to transport, receive, and possess stolen goods in violation of 18 U. S. C. §§ 2, 2314, 2115, and 659. Count two charged petitioner and others with conspiring to obstruct interstate commerce in violation of 18 U. S. C. § 1951 (b)(1). Count three charged that petitioner had transported stolen goods; count four charged that he had received stolen goods; and count five charged petitioner with possession of stolen goods.

orders of March 14, April 5, and April 27, 1973. Intercepted telephone conversations showed that petitioner had arranged for the storage at Higgins' warehouse and had helped negotiate the terms for that storage. One telephone conversation that took place after Higgins' arrest made clear that petitioner had given advice to others involved in the robbery to "sit tight" and not to use the telephone. Finally, the Government introduced transcripts of conversations intercepted from petitioner's office under the April 5 bugging order. In these conversations, petitioner had discussed with various participants in the robbery how best to proceed after their confederates had been arrested. The unmistakable inference to be drawn from petitioner's statements in these conversations is that he was an active participant in the scheme to steal the truckload of fabric.

Before trial, petitioner moved to suppress evidence obtained through the interception of conversations by means of the device installed in his office. The District Court denied the suppression motion without prejudice to its being renewed following trial. After petitioner was convicted on two counts,[6] he renewed his motion and the court held an evidentiary hearing concerning the method by which the electronic device had been installed. At this hearing it was shown that, although the April 5 court order did not explicitly authorize entry of petitioner's business, the FBI agents assigned the task of implementing the order had entered petitioner's office secretly at midnight on April 5 and had spent three hours in the building installing an electronic bug in the ceiling. All electronic surveillance of petitioner ended on May 16, 1973, at which time the agents re-entered petitioner's office and removed the bug.

In denying a second time petitioner's motion to suppress the evidence obtained from the bug, the trial court ruled

---

[6] Petitioner was convicted of receiving stolen goods and conspiring to transport, receive, and possess stolen goods. See n. 5, *supra*.

that under Title III a covert entry to install electronic eavesdropping equipment is not unlawful merely because the court approving the surveillance did not explicitly authorize such an entry. 426 F. Supp. 862 (1977). Indeed, in the court's view, "implicit in the court's order [authorizing electronic surveillance] is concomitant authorization for agents to covertly enter the premises in question and install the necessary equipment." *Id.*, at 866. As the court concluded that the FBI agents who had installed the electronic device were executing a lawful warrant issued by the court, the sole question was whether the method they chose for execution was reasonable. Under the circumstances, the court found the covert entry of petitioner's office to have been "the safest and most successful method of accomplishing the installation." *Ibid.* Indeed, noting that petitioner himself had indicated that such a device could only have been installed through such an entry, the court observed that "[i]n most cases the only form of installing such devices is through breaking and entering. The nature of the act is such that entry must be surreptitious and must not arouse suspicion, and the installation must be done without the knowledge of the residents or occupants." *Ibid.*

The Court of Appeals for the Third Circuit affirmed petitioner's conviction. 575 F. 2d 1344 (1978). Agreeing with the District Court, it rejected petitioner's contention that separate court authorization was necessary for the covert entry of petitioner's office, although it noted that "the more prudent or preferable approach for government agents would be to include a statement regarding the need of a surreptitious entry in a request for the interception of oral communications when a break-in is contemplated." *Id.*, at 1346–1347.

## II

Petitioner first contends that the Fourth Amendment prohibits covert entry of private premises in all cases, irrespective of the reasonableness of the entry or the approval of a court.

He contends that Title III is unconstitutional insofar as it enables courts to authorize covert entries for the installation of electronic bugging devices.

In several cases this Court has implied that in some circumstances covert entry to install electronic bugging devices would be constitutionally acceptable if done pursuant to a search warrant. Thus, for example, in *Irvine* v. *California,* 347 U. S. 128 (1954), the plurality stated that in conducting electronic surveillance, state police officers had "flagrantly, deliberately, and persistently violated the fundamental principle declared by the Fourth Amendment as a restriction on the Federal Government." *Id.,* at 132. It emphasized that the bugging equipment was installed through a covert entry of the defendant's home *"without a search warrant* or other process." *Ibid.* (emphasis added). Similarly, in *Silverman* v. *United States,* 365 U. S. 505, 511–512 (1961), it was noted that "[t]his Court has never held that a federal officer may *without warrant* and without consent physically entrench into a man's office or home, there secretly observe or listen, and relate at the man's subsequent criminal trial what was seen or heard." (Emphasis added.) Implicit in decisions such as *Silverman* and *Irvine* has been the Court's view that covert entries are constitutional in some circumstances, at least if they are made pursuant to warrant.

Moreover, we find no basis for a constitutional rule proscribing all covert entries. It is well established that law officers constitutionally may break and enter to execute a search warrant where such entry is the only means by which the warrant effectively may be executed. See, *e. g., Payne* v. *United States,* 508 F. 2d 1391, 1394 (CA5 1975); cf. *Ker* v. *California,* 374 U. S. 23, 28, 38 (1963); 18 U. S. C. § 3109. Petitioner nonetheless argues that covert entries are unconstitutional for their lack of notice. This argument is frivolous, as was indicated in *Katz* v. *United States,* 389 U. S. 347, 355 n. 16 (1967), where the Court stated that "officers need not

announce their purpose before conducting an otherwise [duly] authorized search if such an announcement would provoke the escape of the suspect or the destruction of critical evidence."[7] In *United States* v. *Donovan,* 429 U. S. 413, 429 n. 19 (1977), we held that Title III provided a constitutionally adequate substitute for advance notice by requiring that once the surveillance operation is completed the authorizing judge must cause notice to be served on those subjected to surveillance. See 18 U. S. C. § 2518 (8)(d). There is no reason why the same notice is not equally sufficient with respect to electronic surveillances requiring covert entry. We make explicit, therefore, what has long been implicit in our decisions dealing with this subject: The Fourth Amendment does not prohibit *per se* a covert entry performed for the purpose of installing otherwise legal electronic bugging equipment.[8]

---

[7] One authority has said that the constitutional validity of covert entries to install bugs "is plainly the consequence of [the] reasoning" of *Katz* v. *United States*. T. Taylor, Two Studies in Constitutional Interpretation 114 (1969).

[8] Petitioner argues that, even if a covert entry would be constitutional in some cases, it was not in the present case, as there was no need for such entry. The District Court, however, specifically found that the "safest and most successful method of accomplishing the installation of the wiretapping device was through breaking and entering [the office]." 426 F. Supp. 862, 866 (1977). Moreover, in issuing the Title III order, the court found that "[n]ormal investigative procedures reasonably appear to be unlikely to succeed and are too dangerous to be used." App. 7a. And in his opinion denying petitioner's subsequent suppression motion, the same judge stated:

"The affidavits which supported the application for the warrant in question indicated that resort to electronic surveillance, to overhear meetings at Dalia's office and conversations on Dalia's telephones, was required to identify the sources of Dalia's stolen goods, those working with him to transport and store stolen property, and the scope of the conspiracy. Oral evidence of this criminal enterprise was only available inside Dalia's business premises." 426 F. Supp., at 866.

The District Court, therefore, concluded that the circumstances required

## III

Petitioner's second contention is that Congress has not given the courts statutory authority to approve covert entries for the purpose of installing electronic surveillance equipment, even if constitutionally it could have done so. Petitioner emphasizes that although Title III sets forth with meticulous care the circumstances in which electronic surveillance is permitted, there is no comparable indication in the statute that covert entry ever may be ordered. Accord, *United States* v. *Santora,* 583 F. 2d 453, 457–458 (CA9 1978).

Title III does not refer explicitly to covert entry. The language, structure, and history of the statute, however, demonstrate that Congress meant to authorize courts—in certain specified circumstances—to approve electronic surveillance without limitation on the means necessary to its accomplishment, so long as they are reasonable under the circumstances. Title III provides a comprehensive scheme for the regulation of electronic surveillance, prohibiting all secret interception of communications except as authorized by certain state and federal judges in response to applications from specified federal and state law enforcement officials. See 18 U. S. C. §§ 2511, 2515, and 2518; *United States* v. *United States District Court,* 407 U. S. 297, 301–302 (1972). Although Congress was fully aware of the distinction between bugging and wiretapping, see S. Rep. No. 1097, 90th Cong., 2d Sess., 68 (1968), Title III by its terms deals with each form of surveillance in essentially the same manner. See 18 U. S. C. §§ 2510 (1) and (2); n. 1, *supra.* Orders authorizing interceptions of either wire or oral communications may be entered only after the court has made specific determinations concerning the likelihood that the interception will disclose evidence of criminal conduct. See 18 U. S. C. § 2518 (3). Moreover, with respect to both wiretapping and bugging, an authorizing court must

the approach used by the officers, and nothing in the record brings this conclusion into question.

specify the exact scope of the surveillance undertaken, enumerating the parties whose communications are to be overheard (if they are known), the place to be monitored, and the agency that will do the monitoring. See 18 U. S. C. § 2518 (4).

The plain effect of the detailed restrictions of § 2518 is to guarantee that wiretapping or bugging occurs only when there is a genuine need for it and only to the extent that it is needed.[9] Once this need has been demonstrated in accord with the requirements of § 2518, the courts have broad authority to "approv[e] interception of wire or oral communications," 18 U. S. C. §§ 2516 (1), (2), subject of course to constitutional limitations. See Part II, *supra*.[10] Nowhere in Title III is there any indication that the authority of courts under § 2518 is to be limited to approving those methods of interception that do not require covert entry for installation of the intercepting equipment.[11]

---

[9] It is clear that Title III serves a substantial public interest. See n. 13, *infra*. Congress and this Court have recognized, however, that electronic surveillance can be a threat to the "cherished privacy of law-abiding citizens" unless it is subjected to the careful supervision prescribed by Title III. See *United States* v. *United States District Court*, 407 U. S. 297, 312 (1972).

[10] Congress explicitly confirmed the breadth of the power it had conferred on courts acting under Title III when it amended the Act in 1970. Pub. L. 91–358, Title II, § 211 (b), 84 Stat. 654. Section 2518 (4) now empowers a court authorizing electronic surveillance to "direct that a . . . landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception *unobtrusively* . . . ." (Emphasis added.) Thus, it appears that Congress anticipated that landlords and custodians may be enlisted to aid law enforcement officials covertly to enter and place the necessary equipment in private areas.

[11] The only limitation Title III places on the manner in which these court orders are to be executed is in its requirements that no order extend beyond 30 days, and that every order must include provisions that it is to be executed as soon as practicable and in a manner that will minimize the

The legislative history of Title III underscores Congress' understanding that courts would authorize electronic surveillance in situations where covert entry of private premises was necessary. Indeed, a close examination of that history reveals that Congress did not explicitly address the question of covert entries in the Act, only because it did not perceive surveillance requiring such entries to differ in any important way from that performed without entry. Testimony before subcommittees considering Title III and related bills indicated that covert entries were a necessary part of most electronic bugging operations. See, e. g., Anti-Crime Program: Hearings on H. R. 5037, etc., before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 1031 (1967). Moreover, throughout the Senate Report on Title III indiscriminate reference is made to the types of surveillance this Court reviewed in *Berger* v. *New York,* 388 U. S. 41 (1967), and *Katz* v. *United States,* 389 U. S. 347 (1967). See, e. g., S. Rep. No. 1097, *supra,* at 74–75, 97, 101–102, 105. Apparently Committee members did not find it significant that *Berger* involved a covert entry, whereas *Katz* did not. Compare *Berger* v. *New York, supra,* at 45, with *Katz* v. *United States, supra,* at 348.[12]

It is understandable, therefore, that by the time Title III

interception of communications not within the purview of the order. See 18 U. S. C. § 2518 (5).

[12] Indeed, the nature of electronic surveillance involved in *Berger* v. *New York* was mentioned on the floor of the Senate, when Senator Long observed that under the New York law, police could "obtain judicial warrants authorizing them to hide bugs in the premises of criminal suspects." 114 Cong. Rec. 14708 (1968). To be sure, in his comments Senator Long did not explicitly suggest that Title III would authorize such covert entries. See *post,* at 272. His statement confirmed, however, what had been strongly indicated prior to the bill's consideration by the full Congress: Members of Congress simply saw no distinction between electronic surveillance which required covert entry and that which required covert tapping of one's telephone. The invasion of the privacy of conversation is the same in both situations.

was discussed on the floor of Congress, those Members who referred to covert entries indicated their understanding that such entries would necessarily be a part of bugging authorized under Title III. Thus, for example, in voicing his support for Title III Senator Tydings emphasized the difficulties attendant upon installing necessary equipment:

> "[S]urveillance is very difficult to use. Tape [*sic*] must be installed on telephones, and wires strung. *Bugs are difficult to install in many places since surreptitious entry is often impossible. Often, more than one entry is necessary to adjust equipment."* 114 Cong. Rec. 12989 (1968) (emphasis added).

In the face of this record, one simply cannot assume that Congress, aware that most bugging requires covert entry, nonetheless wished to except surveillance requiring such entries from the broad authorization of Title III, and that it resolved to do so by remaining silent on the subject. On the contrary, the language and history of Title III convey quite a different explanation for Congress' failure to distinguish between surveillance that requires covert entry and that which does not: Those considering the surveillance legislation understood that, by authorizing electronic interception of oral communications in addition to wire communications, they were necessarily authorizing surreptitious entries.

Finally, Congress' purpose in enacting the statute would be largely thwarted if we were to accept petitioner's invitation to read into Title III a limitation on the courts' authority under § 2518. Congress permitted limited electronic surveillance under Title III because it concluded that both wiretapping and bugging were necessary to enable law enforcement authorities to combat successfully certain forms of crime.[13]

---

[13] Title 18 U. S. C. § 2516 specifies that authorization for electronic surveillance may be sought only with respect to certain enumerated crimes. These include espionage, sabotage, treason, kidnaping, robbery, extortion, murder, various corrupt practices, and counterfeiting. According to the

Absent covert entry, however, almost all electronic bugging would be impossible.[14]  See *United States* v. *Ford,* 414 F. Supp. 879, 882 (DC 1976), aff'd, 180 U. S. App. D. C. 1, 553 F. 2d 146 (1977); McNamara, The Problem of Surreptitious Entry

Senate Report concerning Title III, "[e]ach offense has been chosen either because it is intrinsically serious or because it is characteristic of the operations of organized crime." S. Rep. No. 1097, 90th Cong., 2d Sess., 97 (1968). The need for use of electronic surveillance against organized crime had been thoroughly considered and documented, shortly before Congress began considering Title III, by a special organized-crime Task Force of a Presidential Commission charged with considering crime in the United States. The President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Organized Crime 91–104 (1967); see *United States* v. *United States District Court,* 407 U. S., at 310 n. 9. A summary of the Task Force's conclusions appeared in the Commission's report, which was repeatedly referred to during consideration of Title III. See The President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 200–203 (1967). In Congress, proponents of Title III, after hearing numerous witnesses testify concerning the importance of electronic surveillance in fighting organized crime, recommended the bill to their colleagues as "[l]egislation meeting the constitutional standards set out in [Supreme Court] decisions, and granting law enforcement officers the authority to tap telephone wires and install electronic surveillance devices in the investigation of major crimes." S. Rep. No. 1097, *supra,* at 75; see *id.,* at 74. Indeed, the Senate Report on Title III unequivocally stated that "[t]he major purpose of title III is to combat organized crime." *Id.,* at 70. The rapid developments in technology available to the criminal underworld make it all the more imperative that the Government not "deny to itself the prudent and lawful employment of those very techniques which are employed against the Government and its law-abiding citizens." *United States* v. *United States District Court, supra,* at 312.

[14] Although he cites no authority, MR. JUSTICE STEVENS apparently believes that a practicable alternative to covert entry would be installation of bugging devices through subterfuge. See *post,* at 272. Nowhere in the legislative history of Title III is there any indication that Congress wished to limit its authorization to bugs installed through subterfuge. Moreover, it is difficult to perceive why one means of gaining entry would be less intrusive than another. See, *e. g., United States* v. *Ford,* 414 F. Supp. 879 (DC 1976), aff'd, 180 U. S. App. D. C. 1, 553 F. 2d 146 (1977) (bomb-scare ruse).

to Effectuate Electronic Eavesdrops: How Do You Proceed After the Court Says "Yes"?, 15 Am. Crim. L. Rev. 1, 3 (1977). As recently as 1976, a congressional commission established to study and evaluate the effectiveness of Title III concluded that in most cases electronic surveillance cannot be performed without covert entry into the premises being monitored. See U. S. National Commission for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, Electronic Surveillance 15, 43, and n. 19, 86 (1976). The same conclusion was reached by the American Bar Association committee charged with formulating standards governing use of electronic surveillance. See ABA Project on Minimum Standards for Criminal Justice, Electronic Surveillance 65 n. 175, 149 (App. Draft 1971).[15]

In sum, we conclude that Congress clearly understood that it was conferring power upon the courts to authorize covert entries ancillary to their responsibility to review and approve surveillance applications under the statute. To read the statute otherwise would be to deny the "respect for the policy of Congress [that] must save us from imputing to it a self-defeating, if not disingenuous purpose." *Nardone* v. *United States,* 308 U. S. 338, 341 (1939).[16]

## IV

Petitioner's final contention is that, if covert entries are to be authorized under Title III, the authorizing court must

---

[15] Those few available devices that intercept conversations from outside of a building in many cases are impractical, either because of cost, reliability, or the configuration of the area being monitored. See U. S. National Commission for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, Commission Studies 168–183 (1976); see, *e. g., United States* v. *Ford,* 414 F. Supp., at 881.

[16] As we have concluded that Title III authorizes courts to approve covert entries to install electronic surveillance equipment, we do not consider whether such authority also is conferred by other federal enactments, such as Fed. Rule Crim. Proc. 41 or the All Writs Act, 28 U. S. C. § 1651.

explicitly set forth its approval of such entries before the fact. In this case, as is customary, the court's order constituted the sole written authorization of the surveillance of petitioner's office. As it did not state in terms that the surveillance was to include a covert entry, petitioner insists that the entry violated his Fourth Amendment privacy rights. Accord, *United States* v. *Ford,* 180 U. S. App. D. C., at 25, 553 F. 2d, at 170; *Application of United States,* 563 F. 2d 637, 644 (CA4 1977).[17]

The Fourth Amendment requires that search warrants be issued only "upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Finding these words to be "precise and clear," *Stanford* v. *Texas,* 379 U. S. 476, 481 (1965), this Court has interpreted them to require only three things. First, warrants must be issued by neutral, disinterested magistrates. See, *e. g., Connally* v. *Georgia,* 429 U. S. 245, 250–251 (1977) (*per curiam*); *Shadwick* v. *Tampa,* 407 U. S. 345, 350 (1972); *Coolidge* v. *New Hampshire,* 403 U. S. 443, 459–460 (1971). Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that "the evidence sought will aid in a particular apprehension or conviction" for a particular offense. *Warden* v. *Hayden,* 387 U. S. 294, 307 (1967). Finally, "warrants must particularly describe the 'things to be seized,'" as well as the place to be searched. *Stanford* v. *Texas, supra,* at 485.

---

[17] There is no requirement in Title III that explicit authorization of covert entries be set forth in the court's order. The statutory requirement that the surveillance "should remain under the control and supervision of the authorizing court" 82 Stat. 211, § 801 (d), merely emphasizes that courts acting under 18 U. S. C. § 2518 should utilize their power under § 2518 (6) to require periodic progress reports after the installation of the wiretap or bug. If there is a requirement of explicit judicial authorization for covert entry, therefore, it must come from the Fourth Amendment alone.

In the present case, the April 5 court order authorizing the interception of oral communications occurring within petitioner's office was a warrant issued in full compliance with these traditional Fourth Amendment requirements. It was based upon a neutral magistrate's independent finding of probable cause to believe that petitioner had been and was committing specifically enumerated federal crimes, that petitioner's office was being used "in connection with the commission of [these] offenses," and that bugging the office would result in the interception of "oral communications concerning these offenses." App. 6a–7a. Moreover, the exact location and dimensions of petitioner's office were set forth, see n. 4, *supra,* and the extent of the search was restricted to the "[i]ntercept[ion of] oral communications of Larry Dalia and others as yet unknown, concerning the above-described offenses at the business office of Larry Dalia . . . ." App. 8a.[18]

Petitioner contends, nevertheless, that the April 5 order was insufficient under the Fourth Amendment for its failure to specify that it would be executed by means of a covert

---

[18] Because of the strict requirements of Title III, all of the indicia of a warrant necessarily are present whenever an order under Title III is issued. Accord, *United States* v. *Scafidi,* 564 F. 2d, at 644 (Gurfein, J., concurring). Indeed, it was Congress' express design to create under Title III a mechanism by which search warrants valid under the Fourth Amendment would be issued for electronic surveillance. See S. Rep. No. 1097, *supra* n. 13, at 105; Controlling Crime Through More Effective Law Enforcement: Hearings on S. 300, etc., before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 90th Cong., 1st Sess., 176, 570, 919 (1967); Hearings on H. R. 5037, etc., before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 917, 934 (1967). No less would be required for the court authorization of electronic surveillance under Title III to be constitutional, as electronic surveillance undeniably is a Fourth Amendment intrusion requiring a warrant. See, *e. g., Katz* v. *United States,* 389 U. S. 347, 352–353, 356–357 (1967). And we have explicitly recognized the necessity of a warrant in cases of electronic surveillance. See *United States* v. *United States District Court,* 407 U. S., at 316–320.

entry of his office. Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that, in addition to the three requirements discussed above, search warrants also must include a specification of the precise manner in which they are to be executed. On the contrary, it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant [19]—subject of course to the general Fourth Amendment protection "against unreasonable searches and seizures."

Recognizing that the specificity required by the Fourth Amendment does not generally extend to the means by which warrants are executed, petitioner further argues that warrants for electronic surveillance are unique because often they impinge upon two different Fourth Amendment interests: The surveillance itself interferes only with the right to hold private conversations, whereas the entry subjects the suspect's property to possible damage and personal effects to unauthorized examination. This view of the Warrant Clause parses too finely the interests protected by the Fourth Amendment. Often in executing a warrant the police may find it necessary to interfere with privacy rights not explicitly considered by the judge who issued the warrant. For example, police executing an arrest warrant commonly find it necessary to enter

---

[19] For example, courts have upheld the use of forceful breaking and entering where necessary to effect a warranted search, even though the warrant gave no indication that force had been contemplated. See, e. g., United States v. Gervato, 474 F. 2d 40, 41 (CA3), cert. denied, 414 U. S. 864 (1973). To be sure, often it is impossible to anticipate when these actions will be necessary. See Note, Covert Entry in Electronic Surveillance: The Fourth Amendment Requirements, 47 Ford. L. Rev. 203, 214 (1978). Nothing in the decisions of this Court, however, indicates that officers requesting a warrant would be constitutionally required to set forth the anticipated means for execution even in those cases where they know beforehand that unannounced or forced entry likely will be necessary. See 2 W. LaFave, Search and Seizure 140 (1978).

the suspect's home in order to take him into custody, and they thereby impinge on both privacy and freedom of movement. See, *e. g., United States* v. *Cravero,* 545 F. 2d 406, 421 (CA5 1976) (on petition for rehearing). Similarly, officers executing search warrants on occasion must damage property in order to perform their duty. See, *e. g., United States* v. *Brown,* 556 F. 2d 304, 305 (CA5 1977); *United States* v. *Gervato,* 474 F. 2d 40, 41 (CA3), cert. denied, 414 U. S. 864 (1973).

It would extend the Warrant Clause to the extreme to require that, whenever it is reasonably likely that Fourth Amendment rights may be affected in more than one way, the court must set forth precisely the procedures to be followed by the executing officers. Such an interpretation is unnecessary, as we have held—and the Government concedes—that the manner in which a warrant is executed is subject to later judicial review as to its reasonableness. See *Zurcher* v. *Stanford Daily,* 436 U. S. 547, 559–560 (1978).[20] More important, we would promote empty formalism were we to require magistrates to make explicit what unquestionably is implicit in bugging authorizations:[21] that a covert entry, with its attendant interference with Fourth Amendment interests, may be necessary for the installation of the surveillance equipment. See *United States* v. *London,* 424 F. Supp. 556, 560 (Md. 1976). We conclude, therefore, that the Fourth Amendment does not require that a Title III electronic surveillance order include a

---

[20] The District Court found that covert entry in the present case was reasonable. The officers entered petitioner's office only twice: once to install the bug and once to remove it. There is no indication that their intrusion went beyond what was necessary to install and remove the equipment. See n. 8, *supra.*

[21] In the present case, the District Court specifically noted that its order implicitly had authorized covert entry. See *supra,* at 246. Thus, contrary to the suggestion of the dissent, see *post,* at 270 n. 20, there is no question in this case "of the *Executive's* authority to break and enter at will *without* any judicial authorization."

specific authorization to enter covertly the premises described in the order.[22]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART joins except as to Part I, concurring in part and dissenting in part.

I concur in Parts I and II of the Court's opinion.

## I

I dissent from Part III for the reasons stated in the dissenting opinion of MR. JUSTICE STEVENS which I join.

## II

I also dissent from Part IV. In my view, even reading Title III to authorize covert entries, the Justice Department's present practice of securing specific authorization for covert entries is not only preferable, see *ante,* this page n. 22, but also constitutionally required.

Breaking and entering into private premises for the purpose of planting a bug cannot be characterized as a mere mode of warrant execution to be left to the discretion of the executing officer. See *ante,* at 257. The practice entails an invasion

---

[22] Although explicit authorization of the entry is not constitutionally required, we do agree with the Court of Appeals that the "preferable approach" would be for Government agents in the future to make explicit to the authorizing court their expectation that some form of surreptitious entry will be required to carry out the surveillance. Indeed, the Solicitor General has informed us that the Department of Justice has adopted a policy requiring its officers "[to] include [in applications for Title III orders] a request that the order providing for the interception specifically authorize surreptitious entry for the purpose of installing and removing any electronic interception devices to be utilized in accomplishing the oral interception." See Brief for United States 56.

of privacy of constitutional significance distinct from that which attends nontrespassory surveillance; indeed, it is tantamount to an independent search and seizure. First, rooms may be bugged without the need for surreptitious entry and physical invasion of private premises. See *Lopez* v. *United States,* 373 U. S. 427, 467–468 (1963) (BRENNAN, J., dissenting). Second, covert entry, a practice condemned long before we condemned unwarranted eavesdropping, see *Silverman* v. *United States,* 365 U. S. 505 (1961), breaches physical as well as conversational privacy. The home or office itself, that "inviolate place which is a man's castle," *id.,* at 512 n. 4, is invaded. Third, the practice is particularly intrusive and susceptible to abuse since it leaves naked to the hands and eyes of government agents items beyond the reach of simple eavesdropping.

Because of these additional intrusions attendant to covert entries, the Constitution requires that government agents who wish to break into private premises first secure specific judicial authorization for the surreptitious entry. Authority for the physical invasion cannot be derived from a Title III order authorizing only electronic surveillance.

"[T]he Fourth Amendment confines an officer executing a search warrant strictly within the bounds set by the warrant," *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388, 394 n. 7 (1971), in order to assure that those "searches deemed necessary [remain] as limited as possible." *Coolidge* v. *New Hampshire,* 403 U. S. 443, 467 (1971). See *Stanford* v. *Texas,* 379 U. S. 476, 485 (1965); *Marron* v. *United States,* 275 U. S. 192, 196 (1927).* As a consequence, a warrant that describes

---

*The Court's reliance upon *United States* v. *Cravero,* 545 F. 2d 406, 421 (CA5 1976) (on petition for rehearing), for the opposite proposition is misplaced. In *Cravero,* police could not have anticipated the need to arrest the suspect at his home at the time the arrest warrant was issued. It would have been unreasonable, therefore, to require the warrant to specify a home arrest. Here, by contrast, the covert entry was easily foreseeable. There is no reason why the federal agents who secured the

only the seizure of conversations cannot be read expansively to authorize constitutionally distinct physical invasions of privacy at the discretion of the executing officer. Rather, the Constitution demands that the necessity for home invasion be decided "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948).

I cannot agree that adherence to this principle would amount to "specification of the precise manner" in which Title III orders are executed. See *ante,* at 257. The warrant could, consistent with the command of the Fourth Amendment, leave the details of how best to proceed with the covert entry to the discretion of the executing officers. The warrant need only state, as under the present Justice Department practice, that "surreptitious entry for the purpose of installing and removing any electronic interception devices [is] to be utilized in accomplishing the oral interception." *Ante,* at 259 n. 22.

Nor can I agree that adherence to the strictures of the Warrant and Particularity Clauses of the Fourth Amendment would amount to "empty formalism." See *ante,* at 258. Since premises may be bugged through means less drastic than home invasion, requiring police to secure prior approval for covert entries may well prevent unnecessary and improper intrusions. In any event, that the present case may not appear particularly abusive cannot justify the Court's crabbed interpretation of the Fourth Amendment. Mr. Justice Brad-

---

warrant could not have advised the judge who issued the warrant that they contemplated covert entry. Indeed, the current Justice Department practice of securing specific prior authorization for covert entries demonstrates the practicability of a constitutional prior-authorization requirement.

*United States* v. *Gervato,* 474 F. 2d 40, 41 (CA3 1973), is distinguishable for the same reason and also because *Gervato* involved a mere mode of warrant execution (forcible entry) rather than an invasion of two separate expectations of privacy.

ley's admonition almost a century ago has even greater cogency in today's world of ever more intrusive governmental invasions of privacy:

> "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." *Boyd* v. *United States,* 116 U. S. 616, 635 (1886).

MR. JUSTICE STEVENS, with whom MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL join, dissenting.

At midnight on the night of April 5–6, 1973, three persons pried open a window to petitioner's business office and secretly entered the premises. During the next three hours they moved freely about the building, eventually implanting a listening device in the ceiling. Several weeks later, they again broke into the office at night and removed the device.

The perpetrators of these break-ins were agents of the Federal Bureau of Investigation. Their office, however, carries with it no general warrant to trespass on private property. Without legislative or judicial sanction, the conduct of these agents was unquestionably "unreasonable" and therefore prohibited by the Fourth Amendment.[1] Moreover, that conduct

---

[1] See *United States* v. *United States District Court,* 407 U. S. 297. The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers,

violated the Criminal Code of the State of New Jersey unless it was duly authorized.[2]

The only consideration that arguably might legitimate these "otherwise tortious and possibly criminal" invasions of petitioner's private property,[3] is the fact that a federal judge had entered an order authorizing the agents to use electronic equipment to intercept oral communications at petitioner's office. The order, however, did not describe the kind of equipment to be used and made no reference to an entry, covert or otherwise, into private property. Nor does any statute expressly permit such activity or even authorize a federal judge to enter orders granting federal agents a license to commit criminal trespass. The initial question this case raises, therefore, is whether this kind of power should be read into a statute that does not expressly grant it.

In my opinion, there are three reasons, each sufficient by itself, for refusing to do so. First, until Congress has stated otherwise, our duty to protect the rights of the individual should hold sway over the interest in more effective law enforcement. Second, the structural detail of this statute precludes a reading that converts silence into thunder. Third, the legislative history affirmatively demonstrates that Congress never contemplated the situation now before the Court.

## I

"Congress, like this Court, has an obligation to obey the mandate of the Fourth Amendment." *Marshall* v. *Barlow's, Inc.*, 436 U. S. 307, 334 (STEVENS, J., dissenting). But Congress is better equipped than the Judiciary to make the empiri-

---

and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

[2] N. J. Stat. Ann. §§ 2A:94–1, 2A:94–3 (West 1969).

[3] T. Taylor, Two Studies in Constitutional Interpretation 110 (1969).

cal judgment that a previously unauthorized investigative technique represents a "reasonable" accommodation between the privacy interests protected by the Fourth Amendment and effective law enforcement.[4] Throughout our history, therefore, it has been Congress that has taken the lead in granting new authority to invade the citizen's privacy.[5] It is appropriate to accord special deference to Congress whenever it has expressly balanced the need for a new investigatory technique against the undesirable consequences of any intrusion on constitutionally protected interests in privacy. See *id.*, at 334–339.

But no comparable deference should be given federal intrusions on privacy that are not expressly authorized by Congress.[6] In my view, a proper respect for Congress' important

---

[4] Cf. *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338, 353; *United States* v. *Biswell,* 406 U. S. 311; *Colonnade Catering Corp.* v. *United States,* 397 U. S. 72, 76.

[5] "Beginning with the Act of July 31, 1789, 1 Stat. 29, 43, and concluding with the Omnibus Crime Control and Safe Streets Act of 1968, 82 Stat. 197, 219, 238, Congress has enacted a series of over 35 different statutes granting federal judges the power to issue search warrants of one form or another. These statutes have one characteristic in common: they are specific in their grants of authority and in their inclusion of limitations on either the places to be searched, the objects of the search, or the requirements for the issuance of a warrant." *United States* v. *New York Telephone Co.,* 434 U. S. 159, 179–180 (STEVENS, J., dissenting in part) (footnote omitted).

Mr. Justice Frankfurter gathered the pre-1945 statutes in his dissenting opinion in *Davis* v. *United States,* 328 U. S. 582, 616–623. He commented that "[w]hat is significant about this legislation is the recognition by Congress of the necessity for specific Congressional authorization even for the search of vessels and other moving vehicles and the seizures of goods technically contraband." *Id.,* at 616, n.

[6] I realize that since *Mapp* v. *Ohio,* 367 U. S. 643, the Court has applied the same Fourth Amendment principles to state and federal law enforcement officers alike. Nonetheless, I purposely limit my discussion here to the federal context. For purposes of discussing the necessity of statutory authority, it seems useful to me to treat the Fourth Amendment concept

role in this area, as well as our tradition of interpreting statutes to avoid constitutional issues,[7] compels this conclusion.

The Court does not share this view. For this is the third time in as many years that it has condoned a serious intrusion on privacy that was not explicitly authorized by statute and that admittedly raised a substantial constitutional question. In *United States* v. *Ramsey*, 431 U. S. 606, the Court upheld an Executive regulation authorizing postal inspectors to open private letters without probable cause to believe they contained contraband.[8] In *United States* v. *New York Telephone Co.*, 434 U. S. 159, the Court upheld orders authorizing the surreptitious pen-register surveillance of an individual and directing a private company to lend its assistance in that endeavor. Again, no explicit statutory authority existed for either order, despite Congress' otherwise comprehensive treatment of wire surveillance in Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III).[9]

---

of reasonableness as flexible enough to recognize differences between state and federal courts and police forces. Thus, because the power of the Federal Government to combat crime, like the jurisdiction of its courts, is more limited than the comparable power and jurisdiction inhering in the States, it is logical in the federal context to assume that governmental authority is lacking unless expressly mandated by legislation. See, *e. g.*, *Palmore* v. *United States*, 411 U. S. 389, 396; *Cheng Fan Kwok* v. *INS*, 392 U. S. 206; *United States* v. *Five Gambling Devices*, 346 U. S. 441.

[7] See *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U. S. 10; *Machinists* v. *Street*, 367 U. S. 740; *Hannah* v. *Larche*, 363 U. S. 420, 430; *Murray* v. *The Charming Betsy*, 2 Cranch 64.

[8] It found authority for those searches in the Postal Service's recent reinterpretation of an awkwardly drawn 1866 statute that authorized certain border searches of "vessels" but that could not reasonably be read to authorize either the mail openings themselves or the regulation allowing them. Moreover, its adoption of that interpretation left it no choice but to resolve a troublesome constitutional question without any considered guidance from Congress. See 431 U. S., at 625–632 (STEVENS, J., dissenting).

[9] See 434 U. S., at 178–190 (STEVENS, J., dissenting in part).

Today the Court has gone even further in finding an implicit grant of Executive power in Title III. That Title "does not refer explicitly to covert entry" of any kind, much less to entries that are tortious or criminal. *Ante*, at 249. Nevertheless, the Court holds that Congress, without having said so explicitly, has authorized the agents of a national police force in carrying out a surveillance order to break into private premises [10] in violation of state law. Moreover, the Court finds in the silent statute an open-ended authorization to effect such illegal entries without an explicit judicial determination that there is probable cause to believe they are necessary or even appropriate. In my judgment, it is most unrealistic to assume that Congress granted such broad and controversial authority to the Executive without making its intention to do so unmistakably plain. This is the paradigm case in which "the exact words of the statute provide the surest guide to determining Congress' intent." [11] I would not enlarge the coverage of the statute beyond its plain meaning.

## II

The Court's conclusion that the statute implicitly authorizes breaking and entering is especially anomalous because the statutory scheme in all other respects is exhaustive and ex-

---

[10] Although this case involves an office, the invasion of a home would raise precisely the same statutory issue.

[11] "Congress drafted [Title III] with exacting precision. As its principal sponsor, Senator McClellan, put it:

" '[A] bill as controversial as this . . . requires close attention to the dotting of every "i" and the crossing of every "t" . . . .' [114 Cong. Rec. 14751 (1968).]

"Under these circumstances, the exact words of the statute provide the surest guide to determining Congress' intent, and we would do well to confine ourselves to that area." *United States* v. *Donovan*, 429 U. S. 413, 441 (BURGER, C. J., concurring in part and dissenting in part).

plicit.[12] "It simply does not make sense"[13] to conclude that Congress—having minutely detailed (1) the process that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General" must follow in authorizing federal police officers to seek an electronic surveillance order,[14] (2) the limited number of suspected offenses that will justify such an order,[15] (3) the showing that must be made to "a Federal judge" before he issues the order,[16] (4) the

[12] See *ante,* at 249–250; nn. 13–18, *infra,* and text accompanying.

[13] As Judge Merritt, writing for the Sixth Circuit, cogently observed:

"It simply does not make sense to imply Congressional authority for official break-ins when not a single line or word of the statute even mentions the possibility, much less limits or defines the scope of the power or describes the circumstances under which such conduct, normally unlawful, may take place. As the dissents of Holmes and Brandeis in *Olmstead* [v. *United States,* 277 U. S. 438] suggest, this is a serious, if not a 'dirty,' business; and we do not believe we should imply the power to break in under the statute, as the government argues, when Congress has not confronted and debated the issue and expressed such an intention clearly.

. . . . .

"In some circumstances, the installation of an electronic bug may not be possible without a forcible breaking and entering of the suspect's premises, but that does not imply that the power to break and enter is subsumed in the warrant to seize the words. The breaking and entering aggravates the search, and it intrudes upon property and privacy interests not weighed in the statutory scheme, interests which have independent social value unrelated to confidential speech. We are not inclined to give the government the right by implication to intrude upon these interests by conducting official break-ins, especially when the purpose is secretly to monitor and record private conversations, a dangerous power otherwise carefully limited and defined by statute." *United States* v. *Finazzo,* 583 F. 2d 837, 841–842 (CA6 1978). See also *United States* v. *Santora,* 583 F. 2d 453, 456–466 (CA9 1978).

[14] 18 U. S. C. § 2516 (1).

[15] 18 U. S. C. §§ 2516 (1) (a)–(g).

[16] "Each application for an order authorizing or approving the interception of a wire or oral communication shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall state the

standard the judge must apply in approving, and the format
he must follow in preparing, the order,[17] (5) the time frame
of execution and the manner of execution with respect to

applicant's authority to make such application. Each application shall
include the following information:

"(a) the identity of the investigative or law enforcement officer making
the application, and the officer authorizing the application;

"(b) a full and complete statement of the facts and circumstances relied
upon by the applicant, to justify his belief that an order should be issued,
including (i) details as to the particular offense that has been, is being, or
is about to be committed, (ii) a particular description of the nature and
location of the facilities from which or the place where the communication
is to be intercepted, (iii) a particular description of the type of communi-
cations sought to be intercepted, (iv) the identity of the person, if known,
committing the offense and whose communications are to be intercepted;

"(c) a full and complete statement as to whether or not other investiga-
tive procedures have been tried and failed or why they reasonably appear
to be unlikely to succeed if tried or to be too dangerous;

"(d) a statement of the period of time for which the interception is
required to be maintained. If the nature of the investigation is such that
the authorization for interception should not automatically terminate when
the described type of communication has been first obtained, a particular
description of facts establishing probable cause to believe that additional
communications of the same type will occur thereafter;

"(e) a full and complete statement of the facts concerning all previous
applications known to the individual authorizing and making the applica-
tion, made to any judge for authorization to intercept, or for approval of
interceptions of, wire or oral communications involving any of the same
persons, facilities or places specified in the application, and the action taken
by the judge on each such application; and

"(f) where the application is for the extension of an order, a statement
setting forth the results thus far obtained from the interception, or a
reasonable explanation of the failure to obtain such results." 18 U. S. C.
§ 2518 (1).

[17] "(3) Upon such application the judge may enter an ex parte order,
as requested or as modified, authorizing or approving interception of wire
or oral communications within the territorial jurisdiction of the court in
which the judge is sitting, if the judge determines on the basis of the facts
submitted by the applicant that—

"(a) there is probable cause for belief that an individual is committing,

minimizing the interception of communications not likely to involve criminal activity,[18] and even having more recently specified (6) certain "unobtrusive" means by which those

---

has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

"(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

"(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

"(d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

"(4) Each order authorizing or approving the interception of any wire or oral communication shall specify—

"(a) the identity of the person, if known, whose communications are to be intercepted;

"(b) the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted;

"(c) a particular description of the type of communication sought to be intercepted, and a statement of the particular offense to which it relates;

"(d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application; and

"(e) the period of time during which such interception is authorized, including a statement as to whether or not the interception shall automatically terminate when the described communication has been first obtained. . . ."  18 U. S. C. §§ 2518 (3), (4).

[18] "No order entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. Extensions of an order may be granted, but only upon application for an extension made in accordance with subsection (1) of this section and the court making the findings required by subsection (3) of this section. The period of extension shall be no longer than the authorizing judge deems necessary to achieve the purposes for which it was granted and in no event for longer than thirty days. Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not other-

orders might be carried out without the awareness of the suspect [19]—was content to leave national police officers with unbounded authority to carry out the resulting orders in any unspecified and obtrusive fashion they chose "subject of course to constitutional limitations." *Ante,* at 250.[20]

wise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days." 18 U. S. C. § 2518 (5).

The statute also details procedures for the storage and protective custody of the resulting tapes, 18 U. S. C. §§ 2518 (8) (a)–(c), for authorized disclosures and uses of the tapes both in and out of court, 18 U. S. C. §§ 2517, 2518 (9), and for after-the-fact notice to persons whose conversations were overheard. 18 U. S. C. § 2518 (8) (d).

[19] The following provision was added to Title III in 1970:

"An order authorizing the interception of a wire or oral communication shall, upon request of the applicant, direct that a communication common carrier, landlord, custodian or other person shall furnish the applicant forthwith all information, facilities, and technical assistance necessary to accomplish the interception unobtrusively and with a minimum of interference with the services that such carrier, landlord, custodian, or person is according the person whose communications are to be intercepted. Any communication common carrier, landlord, custodian or other person furnishing such facilities or technical assistance shall be compensated therefor by the applicant at the prevailing rates." 18 U. S. C. § 2518 (4).

[20] The Court analyzes this problem as simply one of *Judicial* authority under the statute. *Ante,* at 250, and n. 10. Even if I could agree that Title III afforded judges "broad" and unconfined authority with respect to break-ins, I would still be left with the problem, never mentioned by the Court, of the *Executive's* authority to break and enter at will *without* any judicial authorization.

Indeed, I am not at all certain that the Court puts any confines on either Judicial or Executive authority in this area, despite the lip service it pays to "constitutional limitations." For, having stated that "breaking and entering" in execution of a search warrant is constitutionally permissible "where such entry is the *only* means by which the warrant effectively may be executed," *ante,* at 247 (emphasis added), the Court then equates a surveillance order with a search warrant, but see Taylor, *supra* n. 3, at 84–85, and allows a break-in under the former upon a showing merely that the break-in was "the safest and most successful," rather than the "only," method of installing the device. 426 F. Supp. 862, 866.

In my view, it is the opposite conclusion that is true to the statutory structure. For "one simply cannot assume that Congress," see *ante,* at 252, wished to erect various procedural barriers against poor judgment on the part of the Attorney General and his subordinates in seeking, and on the part of federal district judges in issuing, eavesdropping orders only to commit their execution, even through illegal means, entirely to "the judgment and moderation of officers whose own interests and records are often at stake in the search." *Brinegar* v. *United States,* 338 U. S. 160, 182 (Jackson, J., dissenting). The detailed timing and minimization restrictions on the executing officer, see n. 18, *supra,* as well as the 1970 amendment to Title III concerning "unobtrusive" execution, see n. 19, *supra,* lead inescapably to the conclusion that Congress withheld authority to trespass on private property except through the limited means expressly dealt with in the statute.[21]

## III

Only one relevant conclusion can be drawn from a review of the entire legislative history of Title III. The legislators never even considered the possibility that they were passing a statute that would authorize federal agents to break into private premises without any finding of necessity by a neutral and detached magistrate.

## A

The meager legislative remarks that are said to demonstrate that Title III's supporters implicitly endorsed breaking and

---

[21] A Congress that was careful to limit the temporal extent of electronic surveillance and the opportunity for it to infringe on protected (*i. e.,* noncriminal) conversations, and one so quick to amend the statute to provide for "unobtrusive" entry through the aid of private persons (*i. e.,* "custodians" and "landlords") who already have a degree of access to the property, surely cannot have condoned unlimited and unauthorized breaking and entering by police officers with the aid of nothing but a burglar's tools.

entering in order to install listening devices actually provide no support for that conclusion.

The reference to "judicial warrants authorizing [police] to hide bugs in the premises of criminal suspects," see *ante,* at 251 n. 12, was a comment by an *opponent* of the bill on investigative techniques that he believed this Court had ruled *illegal* in *Berger* v. *New York,* 388 U. S. 41.[22]  Since neither he, nor any supporter of the bill, suggested that those techniques would be authorized by Title III, his comment is hardly indicative of a legislative endorsement of such practices.  Moreover, there is a marked difference between the judicially warranted "hid[ing of] bugs in the premises of criminal suspects" and a forcible entry that has not been expressly authorized by any judge.  The difference between subterfuge and forcible trespass should not be ignored.

That difference explains why the Court's reliance on two statements by proponents of Title III that emphasize the technological limitations on "bugs" and "taps" is misplaced. The proponents believed these limitations would discourage the frequent use and abuse of electronic surveillance.  Thus, in answer to repeated charges that passage of Title III would recreate Hitler's Germany or anticipate Orwell's "1984," Senator Tydings, in a passage partially quoted by the Court, *ante,* at 252, argued:

> "Contrary to what we have heard, electronic surveillance is not a lazy way to conduct an investigation.  *It*

---

[22] In full, the paragraph excerpted by the Court is as follows:

"In Berger against the State of New York, decided on June 12, 1967, the majority of the Court, speaking through Mr. Justice Clark, threw out the New York State court-approved eavesdropping statute, declaring it to be unconstitutional.  The New York statute permitted the police to obtain judicial warrants authorizing them to hide bugs in the premises of criminal suspects.  The Court's majority opinion outlawed this bugging statute because, it said, the procedures did not contain specific safeguards against violations of the fourth amendment, which limited police searches."  114 Cong. Rec. 14708 (1968) (Sen. Long of Missouri).

*will not be used wholesale as a substitute for physical investigation.*

. . . . .

"The reason[s] for such sparing use are simple. First, electronic surveillance is really useful only in conspiratorial activities. . . .

"Second, surveillance is very difficult to use. Tape must be installed on telephones and wires strung. *Bugs are difficult to install in many places since surreptitious entry is often impossible.* Often, more than one entry is necessary to adjust equipment. . . .

"Third, monitoring this equipment requires the expenditure of a great amount of law enforcement's time . . . ." 114 Cong. Rec. 12988–12989 (1968) (emphasis added).[23]

Read in context, this and like commentary are inconsistent with, rather than an endorsement of, unauthorized break-ins. For although it is of course true that surreptitious entry is often "impossible" when it must be accomplished without violating the law, surreptitious entry is by no means impossible (indeed, it is hardly "difficult") if it may be effected by whatever means the police—unhampered by the provisions of the criminal law—can bring to their disposal. Despite the Court's understanding of it, I read Senator Tydings' remark as only one of many expressions by Title III's supporters of their belief that authorized electronic surveillance would be "carefully circumscribed," *id.,* at 13203 (Sen. Scott) and "rigidly controlled," *id.,* at 14715 (Sen. Tydings), not only by technology but also by "strict court supervision," *id.,* at 13200 (Sen. Scott), the "strictest guidelines," *id.,* at 16076

---

[23] See also Anti-Crime Programs: Hearings on H. R. 5037, etc., before Subcommittee No. 5 of the House Committee on the Judiciary, 90th Cong., 1st Sess., 1031 (1967), cited *ante,* at 251.

(Rep. Harsha), and "an elaborate system of checks and safeguards." *Id.*, at 13204 (Sen. Scott).[24]

Even the opponents of Title III, in parading before Congress the various invasions of privacy that they felt would accompany the passage of the statute, never once referred to breaking and entering private property. *E. g., id.*, at 14710 (Sen. Cooper); *id.*, at 14732 (Sen. Yarborough); *id.*, at 16066 (Rep. Celler). That they omitted such references while decrying far less aggravated invasions is strong evidence that they, at least, never thought about the issue that this case raises.[25] And since the sponsors of the legislation expressly stated that they had specified "every possible constitutional safeguard for the rights of individual privacy," *id.*, at

----

[24] "[Title III] sets forth in the most elaborate and precise detail the safeguards surrounding the application to a court of competent jurisdiction for authority to make a wiretap. I am satisfied that it is fully designed to guard against any unwarranted invasion of the precious right of privacy." 114 Cong. Rec. 16276 (1968) (Rep. MacGregor). See also *id.*, at 14763 (Sen. Percy); *id.*, at 16296 (Rep. Boland); S. Rep. No. 1097, 90th Cong., 2d Sess., 66 (1968).

On at least two occasions the Court has commented on the circumspection with which Title III was drafted:

"[Title III] sets forth the detailed and particularized application necessary to obtain such an order as well as the *carefully circumscribed conditions for its use.* The Act represents a comprehensive attempt by Congress to promote more effective control of crime while protecting the privacy of individual thought and expression." *United States* v. *United States District Court*, 407 U. S., at 302 (emphasis added). See also *Gelbard* v. *United States*, 408 U. S. 41, 48. See also n. 8, *supra*.

[25] Had Congress expressly considered the issue, I am confident that it would not have granted the Executive the broad authority to break and enter that is conferred by the Court in today's decision. Illustrative of its probable reaction to such investigative techniques are the responses of some Members to the officially sanctioned break-in committed against the office of Daniel Ellsberg's psychiatrist, and to the possibility of official participation in the Watergate break-in. *E. g.,* 119 Cong. Rec. 14607–14608 (1973) (Sen. Edwards); *id.*, at 15332 (Rep. Sarasin).

14469 (Sen. McClellan),[26] their omission of any significant reference to these aggravated intrusions surely demonstrates that they did not consider this issue either.

In sum, as far as my research reveals, during the debates on Title III neither the proponents nor the opponents of the bill directly or indirectly expressed the view that the statute would authorize uninvited forcible trespasses by police officers as a means of implanting a listening device.

## B

Because the drafters of Title III made "indiscriminate reference . . . to the types of surveillance this Court reviewed" in prior cases, *ante,* at 251, the Court draws the conclusion that Congress meant to authorize all "types of surveillance" discussed in those cases. The premise does not support the conclusion.

Many of those cases, including the two specifically cited by the Court,[27] held that the police conduct involved was unlawful. Rather than endorsing all of the techniques discussed in those cases, Congress was quite clearly trying to *avoid* the incidents of unconstitutionality those cases had

---

[26] The dimensions of the constitutional protection of privacy were certainly not underestimated by the supporters of Title III. Senator Lausche, for example, had this to say about the intent of the Framers of the Fourth Amendment:

"[T]hey also knew that the innocent individual would be protected in his home; that no one shall enter. Even though it is a hovel, to him it is a palace. So they wrote into the Constitution, regardless of how poor one's home may be, that it shall not be entered by the government without the law-enforcement official having first obtained a warrant for search and seizure issued on the basis of evidence establishing probable cause." 114 Cong. Rec. 14729 (1968).

[27] *Katz* v. *United States,* 389 U. S. 347; *Berger* v. *New York,* 388 U. S. 41. See also *Silverman* v. *United States,* 365 U. S. 505; *Irvine* v. *California,* 347 U. S. 128.

identified.[28]    Moreover, in drafting Title III, the Senate Judiciary Committee did more than merely isolate and exclude from the bill the illegal elements of the police activity involved in those cases.   Thus, the Chairman of the Committee, in answer to a colleague's question whether Title III was drafted in conformity with the Fourth Amendment, stated:

> "Completely so, let me say to my friend.   Completely so, and it is *even more restrictive*.   We have gone to every length which is proper, we think, to protect people's privacy."   114 Cong. Rec. 14470 (1968).

It is of greater importance, however, that although Congress was concerned with the "types of *surveillance*" involved in our prior cases, none of the congressional references to those cases discussed the type of *entry* made to effectuate the surveillance.   Not a word in any of those pre-1968 opinions, save one, described an illegal entry or even implied that such an entry had occurred.   Those opinions instead described situations in which a listening device had been surreptitiously placed: against an office wall in order to hear conversations in the next office, *Goldman* v. *United States,* 316 U. S. 129; on the person of a federal agent who recorded a conversation in the defendant's laundry, *On Lee* v. *United States,* 343 U. S. 747; in a cabaret, *Lopez* v. *United States,* 373 U. S. 427; in a law office, *Osborn* v. *United States,* 385 U. S. 323; against a spike inserted under a party wall, *Silverman* v. *United States,* 365 U. S. 505; on the outside of a public telephone booth, *Katz* v. *United States,* 389 U. S. 347; and inside a private office, *Berger* v. *New York,* 388 U. S. 41.   It is, of course, true that the conduct in each cited case was surreptitious, but there is a vast difference between detective work that is merely clandestine and work that involves breaking and entering into private property.   Before the decisions in *Katz* and *Berger,* the former technique was considered to be lawful, warrant or

---

[28] See S. Rep. No. 1097, *supra,* at 66, 75, 101.

no warrant,[29] whereas the latter was considered unlawful.[30] The fact that Congress was prepared to enact a statute authorizing practices previously thought to be lawful surely does not justify the conclusion that it was equally prepared to authorize conduct that had always been made unlawful by the criminal laws of the various States.

*Irvine* v. *California,* 347 U. S. 128, was the only pre-1968 case in which this Court had actually confronted the implantation of an electronic listening device by way of a "trespass, and probably a burglary, for which any unofficial person should be, and probably would be, severely punished." *Id.,* at 132.[31] The plurality of four, speaking through Mr. Justice Jackson, had this to say about the police conduct in that case:

> "That officers of the law would break and enter a home, secrete such a device even in a bedroom, and listen to the conversations of the occupants for over a month would be incredible if it were not admitted. Few police measures have come to our attention that more flagrantly, deliberately, and persistently violated the funda-

---

[29] *E. g., On Lee* v. *United States,* 343 U. S. 747; *Goldman* v. *United States,* 316 U. S. 129; *Olmstead* v. *United States,* 277 U. S. 438.

[30] *E. g., Silverman* v. *United States, supra; Irvine* v. *California, supra.*

[31] Mr. Justice Jackson described the entry as follows:

"On December 1, 1951, while Irvine and his wife were absent from their home, an officer arranged to have a locksmith go there and make a door key. Two days later, again in the absence of occupants, officers and a technician made entry into the home by the use of this key and installed a concealed microphone in the hall. A hole was bored in the roof of the house and wires were strung to transmit to a neighboring garage whatever sounds the microphone might pick up. Officers were posted in the garage to listen. On December 8, police again made surreptitious entry and moved the microphone, this time hiding it in the bedroom. Twenty days later, they again entered and placed the microphone in a closet, where the device remained until its purpose of enabling the officers to overhear incriminating statements was accomplished." 347 U. S., at 130–131.

mental principle declared by the Fourth Amendment . . . ."
*Ibid.*

No Member of the Court disagreed with this assessment, although a majority refused to overturn the conviction because the exclusionary rule did not then apply to the States. While it is true, as the Court points out, *ante*, at 247, that four Members of the *Irvine* Court adverted to the lack of a "search warrant or other process" to support the entry, 347 U. S., at 132 (while the other three Members who discussed the issue found the police activity "offensive" and "revolting" without relying on the lack of a warrant [32]), it is also true that no Justice condoned a break-in absent some court order explicitly contemplating physical entry on the premises. Under any reading of the case, it cannot be taken as condoning official trespass and burglary absent specific authorization.

More importantly, the fact that Congress cited *Irvine*, without comment or explanation, when it was considering Title III cannot fairly be interpreted as an endorsement of the questionable police behavior that had been condemned so thunderously by Mr. Justice Jackson 14 years earlier. My respect for the lawmaking process forecloses the inference that Congress authorized burglarious conduct by such stealthy legislative history.

## IV

Because it is not supported by either the text of the statute or the scraps of relevant legislative history,[33] I fear that the

---

[32] *Id.*, at 145 (Frankfurter, J., dissenting, joined by Burton, J.) ; *id.*, at 150 (Douglas, J., dissenting).

[33] The Court argues that Congress' goals in enacting the statute would be frustrated if Title III were not read to include the authority exercised by the Government in this case. *Ante*, at 252–254. Of course, if Congress intended to sanction "even the most reprehensible means for securing a conviction," *Irvine*, 347 U. S., at 146 (Frankfurter, J., dissenting), then withholding some of those means would indeed frustrate the legislative purpose. But there is no reason to impute such an intent to Congress or to ignore its conscientious attention to the importance of safeguarding the

Court's holding may reflect an unarticulated presumption that national police officers have the power to carry out a surveillance order by whatever means may be necessary unless explicitly prohibited by the statute or by the Constitution.

But surely the presumption should run the other way. Congressional silence should not be construed to authorize the Executive to violate state criminal laws or to encroach upon constitutionally protected privacy interests. Before confronting the serious constitutional issues raised by the Court's reading of Title III,[34] we should insist upon an unambiguous statement by Congress that this sort of police conduct may be authorized by a court and that a specific showing of necessity, or at least probable cause, must precede such an authorization. Without a legislative mandate that is both explicit and specific, I would presume that this flagrant invasion of the citizen's privacy is prohibited. Cf. *United States* v. *New York Telephone Co.*, 434 U. S., at 178–179 (STEVENS, J., dissenting

---

rights of individual privacy. See 114 Cong. Rec. 14469–14470 (1968) (Sen. McClellan); see *supra*, at 272–273, 276.

Congress quite clearly expected exterior *wiretaps* to provide the most effective means of electronic surveillance authorized by Title III. The unavailability of certain interior *"bugs"—i. e.,* those implanted by means of forcible trespass—can hardly be seen as frustrating the entire law enforcement scheme. *E. g.,* S. Rep. No. 1097, supra n. 24, at 72; 114 Cong. Rec. 12988 (1968) (Sen. Tydings); *id.,* at 13206 (Sen. Scott); *id.,* at 14481 (Sen. McClellan); *id.,* at 14714 (Sen. Murphy).

Congress' prediction proved correct:

"Telephone taps apparently account for most instances of electronic surveillance, and this can be accomplished in most circumstances by placing a tap on the line outside the premises of the suspect. According to the final report of the National Commission for Review of Federal and State Laws Relating to Wiretapping and Electronic Surveillance, only 26 out of some 1,220 electronic surveillance orders executed between 1968 and 1973 involved a trespassory intrusion. *National Wiretap Commission, Electronic Surveillance* 15 (1967) . . . ." *United States* v. *Finazzo,* 583 F. 2d, at 841 n. 13.

[34] Compare opinion of the Court, *ante,* at 246–248, 254–259, with opinion of MR. JUSTICE BRENNAN, *ante,* at 259–262.

in part); *United States* v. *Ramsey,* 431 U. S., at 632 (STEVENS, J., dissenting).[35]

I respectfully dissent.

---

[35] In addition to Title III, the Government claims authority for the break-ins under the federal "no-knock" statute, 18 U. S. C. § 3109, and under Fed. Rule Crim. Proc. 41. Because I believe that Title III has preempted the field of electronic surveillance, it is conclusive for me that it nowhere authorizes the entries involved in this case as a means of executing an eavesdropping order. Even if Congress had never enacted Title III, however, I would nonetheless conclude that these other asserted justifications for official breaking and entering are unavailing in this case. Both provisions refer to "warrants" issued by a magistrate with the awareness that their execution would probably require the police to find some otherwise illegal means of entering the premises. No such awareness was evidenced by the District Court when it authorized electronic surveillance in this case. See generally *United States* v. *Finazzo, supra,* at 845–848.