# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 12, 2012         Decided April 17, 2012

No. 11-7033

JERRY YOUNGBEY AND RUBIN BUTLER,
APPELLEES

v.

DARIN MARCH, DET., ET AL.,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-00596)

*Carl J. Schifferle*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With him on the briefs were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

*James C. Cox* argued the cause for appellees. With him on the brief were *Craig A. Cowie*, *Arthur B. Spitzer*, and *Frederick V. Mulhauser*. *Elaine Goldenberg* entered an appearance.

Before: GARLAND and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the court filed PER CURIAM.

Concurring opinion by *Senior Circuit Judge* EDWARDS.

PER CURIAM:  Ms. Jerry Youngbey and Mr. Rubin Butler ("appellees") brought an action arising under 42 U.S.C. § 1983 against a number of District of Columbia Metropolitan Police Department ("MPD") law enforcement personnel ("appellants" or "officers").  Appellees' complaint asserts that various officers and their supervisors violated appellees' Fourth Amendment rights by planning and conducting a 4:00 a.m. search on a warrant that did not authorize a nighttime search and breaking and entering into appellees' home without knocking and announcing their presence.   The complaint also alleges additional Fourth Amendment claims and a variety of local law claims – including assault, false arrest, trespass to chattels and conversion, trespass to realty, negligence *per se*, and intentional infliction of emotional distress – that are not at issue in this appeal.  The District of Columbia was also a defendant before the District Court, but it has not joined in this appeal.

Following discovery, appellants moved for summary judgment, asserting, *inter alia*, that they were entitled to qualified immunity on the claims relating to the officers' nighttime search and their alleged failure to knock and announce.  The District Court rejected appellants' claims of qualified immunity, finding that appellants' failure to knock and announce before entering into appellees' home and the nighttime search violated appellees' clearly established rights under the Fourth Amendment. *Youngbey v. District of Columbia*, 766 F. Supp. 2d 197, 211, 217 (D.D.C. 2011). Appellants now seek interlocutory review, claiming that the District Court erred in denying them qualified immunity on the knock-and-announce and nighttime search claims.  Appellants contend that they committed no constitutional violations in their execution of the search warrant.  They further claim that, even if their actions are determined to be unconstitutional, they are nonetheless entitled to qualified immunity because they did not violate clearly established law.

We agree that appellants are entitled to qualified immunity because neither their no-knock entry of appellees' home nor their nighttime search violated "clearly established law." *See Pearson v. Callahan*, 555 U.S. 223, 243–44 (2009) ("An officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). We are therefore constrained to reverse the judgment of the District Court and remand the case.

## I.  Jurisdiction and the Applicable Standard of Review

This Court has jurisdiction to review the denial of qualified immunity as a "final decision" under 28 U.S.C. § 1291. *See Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985) (holding that a district court ruling denying qualified immunity, to the extent that it turns on an issue of law, is subject to immediate appeal under the collateral order doctrine). It is clear here that the District Court's denials of appellants' requests for qualified immunity "'turn[] on . . . issue[s] of law.'" *Int'l Action Ctr. v. United States*, 365 F.3d 20, 23 (D.C. Cir. 2004) (quoting *Mitchell*, 472 U.S. at 530). For purposes of this appeal, appellants do not contest that they failed to knock and announce before entering into appellees' home; and there is no dispute that appellants executed the search warrant during the nighttime. Therefore, the dispute before the court does not concern "which facts the parties might be able to prove" in support of their claims. *Johnson v. Jones*, 515 U.S. 304, 311 (1995). Rather, the question here is whether appellees' asserted rights were clearly established when appellants executed the search warrant. This involves issues of law which "must be resolved *de novo* on appeal." *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (citation omitted); *see also Mitchell*, 472 U.S. at 528 n.9; *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 402–03 (D.C. Cir. 2006).

## II. The Legal Framework Governing Applications of Qualified Immunity

We need not address on this appeal whether the officers' no-knock, nighttime search violated appellees' Fourth Amendment rights. *See Pearson*, 555 U.S. at 236–38, 243. The dispositive question here is whether, given the circumstances presented by the undisputed record facts, a reasonable police officer would have known that the failure to knock or the nighttime search violated appellees' clearly established Fourth Amendment rights. In other words, the protection of qualified immunity is available if "a reasonable officer could have believed that [his or her actions were] lawful, in light of clearly established law and the information the officers possessed." *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citation omitted).

The Supreme Court "adopted this criterion of 'objective legal reasonableness,' rather than good faith, precisely in order to 'permit the defeat of insubstantial claims without resort to trial.'" *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819, 813 (1982)). "[I]n practice . . . [the inquiry] turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Wilson*, 526 U.S. at 614 (citations omitted) (internal quotation marks omitted). Qualified immunity thus "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citation omitted) (internal quotation marks omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Wilson*, 526 U.S. at 615 (citations omitted) (internal quotation marks omitted).

In determining whether the legal rules at issue are clearly established, a court must look to "cases of controlling authority

in [its] jurisdiction." *Id.* at 617. If there is no such controlling authority, then we must determine whether there is "a consensus of cases of persuasive authority." *Id.*; *see also Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (explaining that in the absence of "controlling authority," a "robust 'consensus of cases of persuasive authority'" is necessary to demonstrate clearly established law (quoting *Wilson*, 526 U.S. at 617)). Since we have found neither controlling precedent of the Supreme Court or this circuit, nor a consensus of persuasive authority from our sister circuits, we must reverse.

Because this appeal challenges the denial of appellants' motions for summary judgment, "we are required to view all facts and draw all reasonable inferences in favor of the nonmoving part[ies]," appellees Youngbey and Butler. *Brosseau v. Haugen*, 543 U.S. 194, 195 n.2 (2004) (per curiam) (citation omitted). We turn now to the relevant facts underlying appellees' Fourth Amendment claims.

## III.  The Material Facts

On July 16, 2008, Robert Mallory was murdered near the 1500 block of F Street, N.E., in Washington, D.C. In the weeks following the murder, appellant March, the lead detective on the case, gathered information that identified John Youngbey, the son of appellee Youngbey, as the principal suspect. On August 13, 2008, Detective March submitted an application for warrants to search three residences, including the home of appellees Youngbey and Butler at 1312 Queen Street, N.E., in Washington, D.C. March's affidavit in support of the warrants states that Mallory died from "multiple gunshot wounds to the body." Aff. in Support of an Application for Search Warrant ("Aff.") 1, *reprinted in* Joint App. ("J.A.") 44. John Youngbey is identified in the affidavit as having confessed to a third party that he shot Mallory. According to the affidavit, the shooting

was prompted by Mallory's derogatory comment about the girlfriend of one of John Youngbey's friends. The affidavit also states that the Court Services and Offender Supervision Agency identified John Youngbey's last home address as 1312 Queen Street, N.E., and that a check of the Washington Area Law Enforcement System's computerized database listed 1312 Queen Street, N.E., as John Youngbey's current address.

Based on March's affidavit, a judge of the Superior Court of the District of Columbia found probable cause to believe that certain evidence related to the murder could be found at 1312 Queen Street. The warrant authorizes the police to search for "[f]irearms, ammunition, holsters, cleaning equipment, receipts, photographs, [and] papers that document criminal activity and that link the defendant to the address." Superior Court of the District of Columbia Search Warrant ("Warrant"), J.A. 43. A preprinted portion of the warrant states that law enforcement officers

> ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime/at any time of the day or night, the designated (person) (premises) (vehicle) (object) for the property specified[.]

*Id.* No part of the reference to "daytime/at any time of the day or night" on the warrant form is crossed out, circled, or otherwise marked.

With this warrant in hand, Detective March sought the assistance of the MPD's Emergency Response Team ("ERT"). Members of the ERT are consulted when a warrant is considered "high risk." The warrant for 1312 Queen Street was categorized as high risk because police officers suspected that John Youngbey had used an assault rifle to kill Mallory.

In their statements of undisputed facts submitted in support of their motions for summary judgment, all but one of the appellants averred that John Youngbey was suspected of using

an assault rifle, assault weapon, assault gun, automatic weapon, or a high-powered weapon to kill Mallory. *See* Defs.' [Bruce and Dumontt] Statement of Material Facts as to Which There Is No Genuine Issue ¶ 1, 5, J.A. 334–35 ("automatic weapon" and "high-powered weapon"); Def. Raymond Chambers' Statement of Material Facts as to Which There Is No Dispute ¶ 6, J.A. 215 ("high-powered assault rifle"); Def. [March's] Statement of Material Facts as to Which There Is No Dispute ¶ 9, J.A. 194 ("assault weapon"); Defs. Miller and Thompson's Statement of Material Facts as to Which There Is No Dispute ¶ 1, J.A. 286 ("assault weapon"); Def. Larry Scott's Statement of Material Facts as to Which There Is No Dispute ¶ 3, J.A. 210 ("assault gun"). In addition, the undisputed facts indicate that before undertaking the search of 1312 Queen Street, the executing officers reviewed the affidavit in support of the warrant. *See* Def. Raymond Chambers' Statement of Material Facts as to Which There Is No Dispute ¶ 10, J.A. 215.

Appellees have never contested the information contained in the affidavit supporting the search warrant; nor have they contested that appellants were familiar with that affidavit before undertaking the search. In addition, the appellees do not contest that before the appellant officers and supervisors conducted the search, they had reason to believe that John Youngbey used an assault rifle to kill Mallory. These facts are thus conceded by appellees.

Following its usual practice, the ERT prepared an "Operational Plan for (H[igh] R[isk] W[arrant]) Service." E.R.T. Operational Plan, J.A. 49. The Operational Plan does not specify the time of day for the search. Nor does it mention that the search is for an assault rifle. John Youngbey is mentioned in the Plan as one of "the persons involved in the shooting." *Id.* However, the portion of the Plan entitled "SUSPECT INFORMATION" is blank, *id.* 50, and the Plan does not otherwise characterize or describe John Youngbey.

At approximately 4:00 a.m. on August 20, 2008, appellants executed the search warrant at 1312 Queen Street. For purposes of this appeal, appellants do not dispute that they failed to knock or announce their presence before breaking the front window of appellees' home and entering the residence.

## IV. The Knock-and-Announce Issue

### 1. *The Knock-and-Announce Requirement and Exceptions to the Rule*

The Fourth Amendment "incorporates the common-law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 387 (1997) (citation omitted); *see also Hudson v. Michigan*, 547 U.S. 586, 589 (2006) (describing the common law principle as "ancient"). This rule protects against personal injury that may result from violence by a surprised resident and the destruction of property that may result from forced entry, and it preserves "those elements of privacy and dignity that can be destroyed by a sudden entrance." *Hudson*, 547 U.S. at 594 (citations omitted). "These interests are not inconsequential." *Richards*, 520 U.S. at 393 n.5.

The knock-and-announce requirement is not inviolate, however. The Supreme Court has recognized that it can "give way 'under circumstances presenting a threat of physical violence,' or 'where police officers have reason to believe that evidence would likely be destroyed if advance notice were given.'" *Id.* at 391 (quoting *Wilson v. Arkansas*, 514 U.S. 927, 936 (1995)).

In amplifying this point, the Court in *Richards* held that,

[i]n order to justify a "no-knock" entry, the police must have a reasonable suspicion that knocking and announcing

> their presence, *under the particular circumstances*, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence.

*Id.* at 394 (emphasis added). Thus, in determining whether the manner of executing a search warrant is consistent with the Fourth Amendment, neither the law enforcement officials nor reviewing courts may "dispens[e] with case-by-case evaluation" of the circumstances particular to the search at hand. *Id.* at 392.

As described in *Richards*, exceptions to the knock-and-announce standard based on "general categor[ies] of criminal behavior present[] at least two serious concerns." *Id.* First, such exceptions result in "considerable overgeneralization." *Id.* at 393. In rejecting a Wisconsin decision allowing police officers to dispense with the knock-and-announce rule whenever a search warrant was issued in connection with a felony drug investigation, the Court explained:

> [W]hile drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree. For example, a search could be conducted at a time when the only individuals present in a residence have no connection with the drug activity and thus will be unlikely to threaten officers or destroy evidence. Or the police could know that the drugs being searched for were of a type or in a location that made them impossible to destroy quickly. In those situations, the asserted governmental interests in preserving evidence and maintaining safety may not outweigh the individual privacy interests intruded upon by a no-knock entry. Wisconsin's blanket rule impermissibly insulates these cases from judicial review.

*Id.* (footnote omitted).

The second serious concern motivating the Court's rejection of categorical exceptions to the knock-and-announce rule is the ease with which "the reasons for creating an exception in one category can . . . be applied to others." *Id.* at 393–94. For example, in *Richards*, the Court explained that Wisconsin's rationale for categorically suspending the knock-and-announce rule in felony drug cases could easily be extended to "[a]rmed bank robbers" who "are, by definition, likely to have weapons." *Id.* at 394. "If a *per se* exception were allowed for each category of criminal investigation that included a considerable – albeit hypothetical – risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless." *Id.* Consequently, the Court concluded that, "in each case, it is the duty of a court confronted with the question to determine whether the *facts and circumstances of the particular entry* justified dispensing with the knock-and-announce requirement." *Id.* (emphasis added).

When assessing the particular circumstances of a case, courts must apply an objective standard of reasonableness. *See Whren v. United States*, 517 U.S. 806, 813 (1996). "Subjective intentions play no role in ordinary . . . Fourth Amendment analysis." *Id.* Information tending to demonstrate "officers' actual motives do not bear on our objective assessment of reasonable suspicion." *United States v. Brown*, 334 F.3d 1161, 1166 (D.C. Cir. 2003) (citations omitted).

### 2. *Analysis*

As we stated in *United States v. Crippen*, 371 F.3d 842 (D.C. Cir. 2004), "[t]here are . . . no bright-line rules or *per se* exceptions to the knock and announce requirement; we must therefore evaluate each claim of exigent circumstances upon 'the facts and circumstances of the particular entry.'" *Id.* at 845 (quoting *Richards*, 520 U.S. at 394). Unsurprisingly, appellants' argument to this court focuses on all of the circumstances that

presented a threat of physical violence during their execution of the search warrant. *See* Appellants' Br. at 22–23.

The main point is that the undisputed record in this case belies appellees' claim that the information possessed by the officers and their supervisors consisted of nothing more than "the mere suspected presence of an assault rifle" at 1312 Queen Street. Appellees' Br. at 43. What the undisputed factual record shows is that the information in the possession of the officers responsible for the no-knock entry of 1312 Queen Street included the kind of particularized facts required by *Richards*. It is uncontested that, before the search, each of the officers was familiar with the lead detective's affidavit supporting the warrant. Thus, each knew that Mallory had died of multiple gunshot wounds. They also knew that John Youngbey was reported to have confessed to killing Mallory. Moreover, there was no information conveyed to the officers to suggest that anyone other than John Youngbey had shot Mallory. In addition, the officers knew that a judicial officer had found probable cause to believe that a search of 1312 Queen Street would uncover a firearm and other evidence related to the homicide. The officers also knew that the affidavit supporting the judicial officer's finding of probable cause stated that both the Court Services and Offender Supervision Agency and the Washington Area Law Enforcement System's computerized database listed 1312 Queen Street, N.E., as John Youngbey's residence.

It is also uncontested that, before they executed the warrant, the officers had at least reasonable suspicion to believe that the weapon used by John Youngbey was an assault rifle, and that the firearm which was the object of the search warrant was that assault rifle. Moreover, the officers and their supervisors had reasonable suspicion to know, based on the affidavit, that John Youngbey had been provoked to kill over nothing more than a verbal slight directed at the girlfriend of

another individual.  Finally, the affidavit made clear that John Youngbey did not kill in the heat of the moment; he drove away, then returned with a weapon and killed Mallory.

In short, contrary to what appellees argue, before the officers acted to break into appellees' home, they and their supervisors had more than enough particularized information to avoid the evils of "overgeneralization" described in *Richards*. There can be no question that the information that the officers possessed prior to their execution of the warrant was ample and particularized and, thus, sufficient to ensure that the officers' actions could not be "impermissibly insulate[d] . . . from judicial review."  *Richards*, 520 U.S. at 393.

In addition, the quantity and quality of the information that the officers had before their no-knock entry gives real content to the objective legal reasonableness inquiry that a court must undertake in determining whether the officers violated appellees' Fourth Amendment rights.   In other words, appellants' claims justifying their no-knock search reflect more than just a "hypothetical" risk of danger to the officers.  *Id.* at 394.

*Kornegay v. Cottingham*, 120 F.3d 392 (3d Cir. 1997), the decision upon which appellees heavily rely, gives us no pause in reaching this conclusion.  In *Kornegay*, the plaintiff sued the police after they had executed a no-knock entry of her home as part of their search for a person, Shannon Selby, suspected of being the accomplice to a murder.  The search warrant was for both Selby and the gun used to commit the murder.  *See id.* at 394, 397.  The Third Circuit concluded that there was at least a question of fact as to whether the no-knock entry "violated clearly established constitutional rights of which a reasonable person would have been aware."  *Id.* at 400.  The court's conclusion rested largely on the weakness of the evidence implicating the alleged accomplice in the shooting, as well as the absence of any evidence whatsoever tying him to the gun.

Thus, the court explained, "the officers knew that Selby had not shot the murder victim." *Id.* In fact, "the officers had conflicting evidence about whether Selby was even involved in the murder." *Id.* Moreover, the officers did not "have evidence that [Selby] possessed the gun that was used." *Id.* As the court found, "[t]here [was] nothing in [the] record to suggest that the officers had information that the murder weapon was in Selby's possession. He did not fire the fatal shot, he was not even reported to have been armed at the scene, and nothing suggests that the police had information that the shooter gave Selby the weapon after the shooting." *Id.* at 398.

*Kornegay* does little to assist appellees, because the more detailed information in the possession of the police officers here bears on the circumstances the police could expect to encounter in searching 1312 Queen Street. In particular, in contrast to the police in *Kornegay*, the officers here had probable cause to believe that the shooter, not a possible accomplice, lived at the residence they were searching. In addition, in contrast to the police in *Kornegay*, the police here at least had some reason to think that the shooter would be in possession of the weapon for which they were searching. The officers here had information that John Youngbey had asserted that he committed the murder, and there was no information that the gun had ever been in the possession of anyone but John Youngbey. In addition, in this case, the information in the affidavit submitted in support of the search warrant gave reasonable grounds to believe that the shooter was easily provoked to violence and that, once provoked, he was not inclined to back down. There was no such evidence in *Kornegay*.

Appellants rely heavily on three decisions – *United States v. Ramirez*, 523 U.S. 65 (1998), *United States v. Geraldo*, 271 F.3d 1112 (D.C. Cir. 2001), and *United States v. Crippen*, 371 F.3d 842 (D.C. Cir. 2004) – in support of their positions that they committed no violations of appellees' Fourth Amendment

rights and that the law was not clearly established that a no-knock entry in this particular situation was unconstitutional. In each of the cited decisions, the court found that the searching officers had reasonable suspicion of danger sufficient to justify suspension of the Fourth Amendment's knock-and-announce requirement.

In *Ramirez*, a judge issued a no-knock warrant granting permission to search Hernan Ramirez's home. *See* 523 U.S. at 68. The subject of the search was a prisoner who had escaped by slipping his handcuffs and knocking over a deputy sheriff. *Id.* The prisoner had twice before attempted escape. The first time, "he struck an officer, kicked out a jail door, assaulted a woman, stole her vehicle, and used it to ram a police vehicle. Another time he attempted escape by using a rope made from torn bedsheets." *Id.* The prisoner was also "reported to have made threats to kill witnesses and police officers, to have tortured people with a hammer, and to have said that he would 'not do federal time.'" *Id.* (citation omitted). The no-knock warrant was obtained on the basis of this information, plus an initial siting of the escapee at the home of Ramirez by a confidential informant and a second siting at the Ramirez home by the informant and a law enforcement official. "Around this time, the confidential informant also told authorities that [Ramirez] might have a stash of guns and drugs hidden in his garage." *Id.* at 68–69. Relying on the fact that the subject of the search "was a prison escapee with a violent past who reportedly had access to a large supply of weapons" and had "vowed that he would 'not do federal time,'" the Court concluded that the officers "certainly had a 'reasonable suspicion' that knocking and announcing their presence might be dangerous to themselves or to others." *Id.* at 71.

In *Geraldo*, FBI agents entered a residence to execute a search warrant without fully complying with the knock-and-announce requirement. This court upheld the entry as

reasonable, because the agents had information that the premises they were searching – an active site for drug sales – had been robbed, and a man residing there "had been seen wearing a revolver, allegedly to protect the residence from additional robberies." 271 F.3d at 1118. Citing *Ramirez*, the court found that the presence of a firearm, combined with circumstances giving rise to a specific threat of violence to the executing officers, excused the police from full compliance with the knock-and-announce rule. "Because the agents had specific knowledge that [a resident] kept a firearm to protect against intruders and therefore might be quick to use it, the agents had reason to suspect danger." *Id.* The court concluded that because "the officers' belief that they were entering a dangerous situation was objectively reasonable, they were not required to knock and wait for a response." *Id.*

In *Crippen*, this court upheld as reasonable a search in which police officers knocked and announced, but waited only four seconds before breaching the house. *See* 371 F.3d at 843. In that case, the police had "learned from a confidential informant that Crippen, a convicted felon, had several weapons in his house," including a sawed-off shotgun and two semi-automatic pistols. *Id.* On the basis of this information, the police obtained a search warrant. However, before the warrant was executed, the confidential informant told the police that Crippen was trying to acquire a rocket launcher. A few days later, the informant reported that he had seen a rocket launcher in Crippen's residence. *Id.* Police officers executing the search were briefed on how quickly this weapon of war could be armed and how, if it were fired at an officer standing in a doorway, "it would go straight through [him]." *Id.* (alteration in original) (internal quotation marks omitted). Taking judicial notice of the fact that "[a] rocket launcher (a/k/a a bazooka), is a high-powered weapon designed for use against hardened targets – such as armored tanks," *id.* at 846 (citation omitted), the court concluded that "[t]he unconventional nature of the weapon and

the speed with which it could be loaded sufficed to create an exigency that ripened almost immediately after the officers knocked and announced their presence and purpose," *id.* (citation omitted). The court therefore concluded that the search satisfied the requirements of the Fourth Amendment.

All that we need answer is whether the facts and reasoning of these cases are close enough to the particular circumstances of the search of 1312 Queen Street to warrant the conclusion that a reasonable officer, possessing the information that appellants here possessed, could reasonably (even if, *arguendo*, mistakenly) decide that the danger posed by the situation justified suspension of the knock-and-announce requirement. To put it another way, we ask:  Were the applicable legal rules so clearly established that any reasonable officer would have been aware that a no-knock entry of 1312 Queen Street would violate the Fourth Amendment?  We think not.

As noted above, in determining whether the Fourth Amendment rights at issue are clearly established, a court must look to "cases of controlling authority in [its] jurisdiction." *Wilson*, 526 U.S. at 617.  *Ramirez*, *Geraldo*, and *Crippen* involve circumstances that differ from the situation faced by appellants in this case.  However, these authorities are close enough to the particular circumstances of the search at issue here that we can say, with assurance, that the law was not clearly established that a no-knock entry in this particular situation was unconstitutional.  In other words, these authorities certainly "[do] not show that the search [here] violated the Fourth Amendment."  *Pearson*, 555 U.S. at 243–44 (citation omitted). And we can find no other "controlling authority" to support the contrary conclusion.  Therefore, having carefully considered the controlling precedent of the Supreme Court and this circuit, as well as the authority from our sister circuits, we agree with appellants that their no-knock entry of appellees' home did not violate "clearly established law."

**V. The Nighttime Search Issue**

Appellees make the further claim that appellants' nighttime search violated their Fourth Amendment rights, because, given the circumstances of this case, "[n]o reasonable officer could have believed that the warrant authorized a nighttime search." Appellees' Br. at 11. The District's warrant form authorizes the officers "to search in the daytime/at any time of the day or night." The judge who issued the warrant did not cross out, circle, or otherwise mark either "in the daytime" or "at any time of the day or night." Appellees conclude that, "[u]nder clearly established law, [this] silence cannot be read as approval of nighttime execution." *Id.* at 11–12. We can find no "clearly established law" under the Fourth Amendment that supports appellees' position that, under the circumstances here, "[n]o reasonable officer could have believed that the warrant authorized a nighttime search." *Id.* at 11.

There are several reasons why appellees' argument fails. First, as the Fourth Circuit noted in *United States v. Rizzi*, "[t]he Supreme Court . . . has never held that the Fourth Amendment prohibits nighttime searches." 434 F.3d 669, 675 (4th Cir. 2006). We agree. Appellants acknowledge that "the timing of a search might affect its reasonableness," but they rightly argue that "[t]he Fourth Amendment does not include a specific protection against executing a warrant at night." Appellants' Br. at 31.

Second, in an effort to advance their respective positions, the parties point us to numerous cases addressing the validity of nighttime searches on assorted warrants under a variety of circumstances. Our review of these cases and our independent research of the issue convinces us that there is no "clearly established law" under the Fourth Amendment prohibiting nighttime searches where the warrant is unmarked or silent as to the authorized time of execution. In particular, we can find neither "controlling authority" nor a "consensus of cases of

persuasive authority," *Wilson*, 526 U.S. at 617, to support appellees' claim that clearly established law under the Fourth Amendment required the nighttime search here to be explicitly authorized by the terms of the warrant. And we can find no such applicable authority to support appellees' claim that, given the particular circumstances of this case, a reasonable officer would have known that the nighttime search violated clearly established law under the Fourth Amendment.

Third, we reject appellees' argument that "no reasonable officer could have believed that a nighttime search conducted pursuant to a warrant authorizing only a daytime search was consistent with the Fourth Amendment," Appellees' Br. at 12, because this argument is based on a false premise. The warrant in this case does not "authoriz[e] *only* a daytime search." Rather, the literal terms of the warrant authorize the officers "to search in the daytime/at any time of the day or night," with no express limitation. Viewing this undisputed fact in the light most favorable to appellees, the warrant is silent on the time of execution. The language of the warrant certainly cannot be construed to authorize *only* a daytime search.

Appellees urge that the search warrant in this case contravenes the law of the District of Columbia and thus violates their clearly established Fourth Amendment rights. On this point, appellees contend that

> under D.C. law, an issuing judge can authorize a nighttime search only if the requesting officer requests one and presents facts to establish one of three narrow statutory justifications for nighttime execution. The requesting officer in this case did neither. . . . [T]he constitutional violation was searching a home at 4 AM without a warrant authorizing the search (or exigent circumstances).

Appellees' Br. at 12.

Appellees essentially assert that where local law informs a

constitutional requirement – here, the principle that "warrants must be issued by neutral, disinterested magistrates," *Dalia v. United States*, 441 U.S. 238, 255 (1979) (citation omitted) – we should consider it. Relatedly, they urge that a reasonable officer cannot generally rely on a warrant that is inconsistent with the law, *see Groh v. Ramirez*, 540 U.S. 551, 561 & n.4 (2004), and that the warrant itself sets the boundaries for a reasonable search, *see Horton v. California*, 496 U.S. 128, 140–41 (1990). As Appellees explain,

> The Constitution demands that the reasonableness of a search be decided "by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The need for such judicial supervision is nowhere more critical than when the police engage in a search like this one – a destructive 4 AM home invasion.
>
> . . . .
>
> Reading the default form as allowing a nighttime search, rather than requiring specific authorization from the neutral judge, undermines the role of the judge in supervising when a nighttime search is warranted and in preventing unnecessarily intrusive searches. As the facts of this case demonstrate, reading the default form to allow a nighttime search would allow the District's officers routinely to evade this critical review, just as they did in this case.

Appellees' Br. at 23–24.

There are two problems with this argument, such that we cannot say that Appellees' understanding of the law accurately captures the "clearly established law" under the Fourth Amendment. First, the Supreme Court has held that the

protections and strictures of the Fourth Amendment are not defined by local law. *See Virginia v. Moore*, 553 U.S. 164, 174 (2008) ("A State is free to prefer one search-and-seizure policy among the range of constitutionally permissible options, but its choice of a more restrictive option does not render the less restrictive ones unreasonable, and hence unconstitutional."); *see also Dalia*, 441 U.S. at 257 ("Nothing in the language of the Constitution or in this Court's decisions interpreting that language suggests that . . . search warrants . . . must include a specification of the precise manner in which they are to be executed.").

Second, even assuming, *arguendo*, that state-law protections control our Fourth Amendment inquiry, D.C. law on nighttime searches is, at best, unclear. The D.C. Code provides that "in the absence of express authorization in the warrant pursuant to section 23-521(f)(5), [a search warrant] shall be executed only during the hours of daylight." D.C. CODE § 23-523(b) (2001 & Supp. 2011). Section 23-521(f)(5), in turn, stipulates that the warrant

> shall contain . . . a direction that the warrant be executed during the hours of daylight or, where the judicial officers have found cause therefor, including one of the grounds set forth in section 23-522(c)(1), and authorization for execution at any time of day or night.

*Id.* § 23-521(f)(5).

These statutory provisions do not address the circumstances that we face here, *i.e.*, a situation in which the terms of the warrant authorize the officers "to search in the daytime/at any time of the day or night," without any express limitations. Furthermore, section 23-521(f)(5) apparently contains a typographical error, substituting "and authorization" for "an authorization." *See* D.C. CODE § 23-521(f)(5) (Supp. V 1978) ("an authorization"); *id.* (1981) ("and authorization"). We

understand the correct words to be "an authorization," and the parties agree. Regardless, the error only contributes to the statute's lack of clarity. The main point, however, is that an alleged violation of local law is not dispositive of the Fourth Amendment issue.

We have little trouble in concluding that there is no clearly established law under the Fourth Amendment that prohibits the nighttime execution of a warrant, where, as here, the warrant does not prohibit such a search. Neither controlling precedent from the Supreme Court or this circuit, nor a consensus of persuasive authority from our sister circuits show that the nighttime search here violated the Fourth Amendment.

## VI. Conclusion

Appellants are entitled to qualified immunity because neither their no-knock entry of appellees' home nor their nighttime search violated "clearly established law." The judgment of the District Court on these issues is hereby reversed, and the case is remanded for trial on the remaining issues.

1

EDWARDS, *Senior Circuit Judge*, concurring: I agree with my colleagues that the question to be addressed in this appeal is not whether the officers' no-knock, nighttime search violated appellees' Fourth Amendment rights, but, rather, whether the officers' actions violated clearly established law. I write separately merely to highlight what I believe to be some salient matters related to the knock-and-announce issue.

I think it is a close question whether appellants' failure to knock and announce their presence before entering appellees' home violated appellees' Fourth Amendment rights. I do not believe, however, that appellants' actions violated clearly established law.

As the *per curiam* opinion makes clear, the Supreme Court's decision in *Richards v. Wisconsin*, 520 U.S. 385 (1997), is crucially important to the disposition of the no-knock issue. In *Richards*, the Court explicitly rejected reliance on categorical, *per se*, or blanket rules to justify exceptions to the general standard that police officers executing a search warrant must knock on the door and announce their identity and purpose before attempting forcible entry of a dwelling. *See id.* at 387–88.

The appellants responsible for the no-knock entry into appellees' home claim that they were justified in their actions because of the threat of physical violence involved in executing the warrant at 1312 Queen Street. Relying primarily on *United States v. Ramirez*, 523 U.S. 65 (1998), *United States v. Geraldo*, 271 F.3d 1112 (D.C. Cir. 2001), and *United States v. Crippen*, 371 F.3d 842 (D.C. Cir. 2004), appellants argue that they committed no constitutional violations in the execution of the search warrant. In the alternative, they argue that "the law was not clearly established that a no-knock entry in this particular situation was unconstitutional." Appellants' Br. at 27.

Appellees counter that appellants' asserted reasonable

suspicion of danger is not sufficiently particularized, but rather rests on nothing more than a prohibited categorical rule or procedure. Appellees contend that "[g]eneralized claims that a murder suspect, a drug dealer, or an armed robber might be violent and be at the home to be searched, or that the item sought is a firearm, are insufficient." Appellees' Br. at 13. Relying primarily on *Richards*, appellees argue that the law prohibiting reliance on such blanket rules is so clearly established that any reasonable officer would have been aware that invocation of such an exception violated the Fourth Amendment. Appellees claim that

> [t]he District takes the position that a search for a gun in a murder suspect's home *always* justifies a no-knock entry. Indeed, at times, the District goes [so] far as to suggest that the mere suspected presence of an assault rifle, with nothing more, would justify the failure to knock and announce. It is impossible to square that position with controlling Supreme Court precedent.

Appellees' Br. at 43 (citations omitted).

In further support of their position, appellees point to cases from several of our sister circuits holding that information regarding the presence of a firearm in the place to be searched is, without more, insufficient to excuse a failure to adhere to the knock-and-announce requirement. *See United States v. Moore*, 91 F.3d 96, 98 (10th Cir. 1996); *United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996); *United States v. Marts*, 986 F.2d 1216, 1218 (8th Cir. 1993). Finally, in support of their argument, appellees rely heavily on *Kornegay v. Cottingham*, 120 F.3d 392 (3d Cir. 1997).

As explained in the *per curiam* opinion, exceptions to the knock-and-announce rule based on general categories of criminal behavior are prohibited by *Richards*. Indeed, in *Crippen*, this court made it clear that

[t]here are . . . no bright-line rules or *per se* exceptions to the knock and announce requirement; we must therefore evaluate each claim of exigent circumstances upon "the facts and circumstances of the particular entry."

371 F.3d at 845 (quoting *Richards*, 520 U.S. at 394).

Thus, there can be little doubt that, under *Richards*, the mere presence of a firearm, without more, cannot justify a no-knock entry. Were it otherwise, the police would always be free to execute a no-knock entry whenever the crime under investigation is possession of a firearm. *Richards* explicitly and unequivocally prohibits such categorical exceptions to the knock-and-announce requirement. Moreover, as appellees point out, the cited decisions from the Sixth, Eighth and Tenth Circuits endorse this principle, as do decisions from the Fourth and Ninth Circuits. *See Gould v. Davis*, 165 F.3d 265, 272 (4th Cir. 1998); *United States v. Fluker*, 543 F.2d 709, 717 (9th Cir. 1976).

Appellants do not seriously contest appellees' contentions regarding *Richards*. In their argument to this court, appellees do not rely exclusively on the fact that the crime under investigation was an armed murder or that the object of the search was a firearm. Rather, they focus on all of the circumstances that posed a threat of violence during the execution of the warrant. *See* Appellants' Br. at 22–23. Appellants note, in passing, that there is a statement in *Crippen* asserting that *Geraldo* "explicitly reserved the question whether the mere presence of a gun could be sufficient" to excuse police from the knock-and-announce requirement. *Crippen*, 371 F.3d at 845 (citing *Geraldo*, 271 F.3d at 1118). This is a curious assertion, because it runs directly counter to the Supreme Court's holding in *Richards* and finds no support in *Geraldo*. In any event, appellants certainly do not rest their case on this misplaced dicta. The law is exactly as indicated elsewhere in *Crippen*: "There are . . . no bright-line rules or *per se* exceptions

to the knock and announce requirement." 371 F.3d at 845 (citing *Richards*, 520 U.S. at 394).

On the record before us, a court might agree with appellees that appellants' no-knock entry contravened the strictures of the Fourth Amendment. However, for the reasons stated in the *per curiam* opinion, I agree that, before the officers entered into appellees' home, they had enough particularized information to avoid the evils of "overgeneralization" noted in *Richards*. *See* 520 U.S. at 393. The record in this case is thus unlike a situation that might be presented if officers sought to justify a failure to follow the knock-and-announce requirement on little more than the type of criminal investigation involved.

Appellees rely heavily on *Kornegay v. Cottingham*, 120 F.3d 392 (3d Cir. 1997), in support of their claim that appellants' actions in this case abridged the commands of *Richards*. The warrant in *Kornegay* authorized a search for a person, Shannon Selby, who was suspected of being the accomplice to a murder, and for the gun used to commit the murder. *See id.* at 394, 397. The warrant was issued on the strength of police information indicating that the plaintiff's home was the residence of the accomplice. *Id.* at 397–98. The district court held that a no-knock entry was justified because the "warrant was for a first degree murder suspect who was a known drug dealer with previous arrests for felony offenses involving the use of a weapon, and the gun used in the murder had not been recovered." *Id.* at 398 (citation omitted).

As described in the *per curiam*, the Third Circuit reversed. Relying primarily on *Richards*, the Third Circuit concluded that "the reasons offered in support of [the no-knock] search merely 'consisted of generalities that bore no relation to the particular premises being searched or the particular circumstances surrounding the search.' That conclusion suggests either that the officers' concern that Selby was armed and dangerous was unreasonable or that the officers employed a generalized

procedure that was unreasonable as applied to Kornegay's home." *Id.* (citation omitted). Citing *Richards*, the court concluded that "the risks generally surrounding murder investigations did not necessarily create an exigent circumstance in this case." *Id.* at 399.

As the *per curiam* opinion points out, however, *Kornegay* does not advance appellees' position, because, in contrast to *Kornegay*, the officers in this case had particularized information bearing on the danger that the police could encounter in executing the search warrant, including a reasonable suspicion to believe that John Youngbey had used an assault weapon to shoot the victim multiple times. It is quite clear from the *per curiam* opinion that the sum total of the circumstances faced by the officers in this case supports inferences of risk greater and more specific than those "generally surrounding murder investigations."

Appellees also argue that appellants' reliance on *United States v. Ramirez*, 523 U.S. 65 (1998), *United States v. Geraldo*, 271 F.3d 1112 (D.C. Cir. 2001), and *United States v. Crippen*, 371 F.3d 842 (D.C. Cir. 2004) is misplaced. There is something to this argument. An assault rifle is a formidable weapon, but it is not a weapon of war capable of breaching a hardened target – such as an armored tank – as was the bazooka at issue in *Crippen*. Moreover, there is no evidence that the officers here were aware of specific threats of violence of the sort that the police searching the premises in *Geraldo* faced. And appellants do not suggest that John Youngbey had anything approaching the violent history toward law enforcement personnel that the escapee in *Ramirez* exhibited. Indeed, appellants' Operational Plan does not characterize John Youngbey as posing a particular risk to the searching officers. Nonetheless, appellants assert that *Ramirez*, *Geraldo*, and *Crippen* conclusively support their claim that their no-knock search did not violate appellants' Fourth Amendment rights. It is far from clear to me that appellants'

actions did not violate appellees' Fourth Amendment rights, but I agree with the *per curiam* opinion that we need not reach this matter.

*Ramirez*, *Geraldo*, and *Crippen* involve circumstances that differ from the situation faced by appellants in this case, and thus may not support appellants' contention that they committed no violation of appellees' Fourth Amendment rights. Nonetheless, I agree with my colleagues that "these authorities are close enough to the particular circumstances of the search at issue here that we can say, with assurance, that the law was not clearly established that a no-knock entry in this particular situation was unconstitutional."