[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17635
Non-Argument Calendar

_____

D.C. Docket No. 6:15-cv-00069-GKS-TBS

LAURA ESPERANZA PENA,

Plaintiff-Appellant,

versus

CHRISTOPHER MARCUS, OSVALDO CRUZ, KRISTOPHER LOTT,
MATTHEW BUTLER, BRIAN BEAULIEU, CHRIS DELOTTE, ERIC
SHELLENBERGER, CHRISTOPHER WRZESIN, and JOHN TORRES,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 6, 2017)

Before MARTIN, JULIE CARNES, and ANDERSON, Circuit Judges.

PER CURIAM:

The Orange County Sheriff's Office ("Sheriff's Office") conducted a search of plaintiff Laura Pena's home.  In executing the entry into the residence and the search, and taking the facts in the light most favorable to the plaintiff, Orange County deputies caused Pena's foot to be fractured, hit her in the shoulder with a rifle, and caused physical damage to her home.  Pena subsequently sued the deputies in their individual capacities under § 1983 and Florida law.  In her complaint, Pena asserts that the deputies used excessive force and unlawfully deprived her of property in violation of the Fourth Amendment of the United States Constitution and that they committed assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence under Florida law.  The district court granted summary judgment to the deputies, concluding that they are entitled to federal qualified immunity and Florida sovereign immunity because they acted reasonably.  Pena appeals the district court's summary judgment order.  We affirm.

## I.    BACKGROUND

### A.    Factual Background

In March 2013, the Sheriff's Office received a tip concerning narcotics and gang activity at 945 Vista Palm Way, which was owned by sixty-seven year old Pena.  The deputies conducted a "trash pull" at the house and found a residue that tested presumptively positive for cannabis.  They also observed Daniel Santiago,

2

Pena's grandson and a suspected CRIPS gang member, enter the home.  When Pena invited deputies into the house, they saw mail, covered in gang symbols, addressed to Santiago.

Averring their belief that Santiago resided at 945 Vista Palm Way and that firearms and controlled substances were present, the deputies sought a warrant to search the residence.  A state court judge issued a warrant to search the home for drugs and firearms.  The parties agree that the warrant is facially valid.

The Special Weapons and Tactical Unit (SWAT) and Gang Enforcement Unit of the Sheriff's Office executed the search warrant on April 12, 2013.  Pena was home at the time with her disabled adult daughter.  As to the events leading up to the deputies' entry into the home, Pena's version of those events has not been consistent.  In her Second Amended Complaint, filed in June of 2015, Pena alleges that the deputies knocked on her front door, announced that they were with the Sheriff's Office, and commanded her to open the door.  According to the Complaint, Pena complied with this order and opened the door, at which point, without any warning, the group of deputies kicked or shoved the door into Pena, causing her to fall to the floor, after which they entered the home and then struck Pena as she lay on the floor.

In her deposition, Pena described a somewhat different version of events. Specifically, she testified that while cooking in her kitchen, she saw men dressed

3

like soldiers and heard them saying something through a megaphone. She heard "a noise" that sounded "like a voice" through a megaphone but "did not hear what they were saying correctly." Two to three minutes passed between when Pena first saw a uniformed man and when she made her way to the front door to open it. At the same moment that Pena went to open her front door and was unlocking it, the SWAT team rammed the door open and Pena was knocked to the ground. As she was lying on the floor, Pena felt something strike her foot. She was unsure whether it was the falling door that hit her or instead whether one of the entering deputies had stepped on her, but thought someone had stepped on her foot. Pena tried to stand up to go to her daughter, but a SWAT team member hit her in the shoulder with a rifle to keep her on the ground.

At any rate, notwithstanding any inconsistencies in Pena's description of the entry, she agrees that the deputies "knocked and announced their authority to enter and conduct a search of the home before entering Plaintiff's residence."

As a result of the deputies' actions, Pena's foot was fractured and she had to wear a cast for several weeks. Her shoulder was bruised and required surgery. In addition, the search damaged Pena's home. Specifically, the SWAT officers broke the front and interior doors, damaged the walls, shattered a window in order to deploy a flash-bang device, and "generally left the house in a sta[te] of disrepair and disarray."

4

### B.    Procedural Background

Pena sued deputies Christopher Marcus, Osvaldo Cruz, Kristopher Lott, Matthew Butler, Brian Beaulieu, Chris Delotte, Eric Shellenberger, Christopher Wrzesin, and John Torres in their individual capacities. She alleges that the deputies used excessive force and unlawfully deprived her of property in violation of the United States Constitution and that they violated numerous Florida laws. The district court granted summary judgment to the deputies, finding that they were entitled to federal qualified immunity and Florida sovereign immunity. Pena appeals this ruling.

## II.    STANDARD OF REVIEW

This court reviews the denial of summary judgment *de novo* and uses the same legal standards as the district court. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013). We grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We view all facts and resolve all doubts in favor of the non-moving party "to the extent supportable by the record." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis omitted); *Feliciano*, 707 F.3d at 1247. An issue is not genuine if it is not supported by evidence. *Baloco v. Drummond Co., Inc.*, 767 F.3d 1229, 1246 (11th Cir. 2014), citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249–50 (1986).

5

### III.    FEDERAL LAW CLAIMS

Pena alleges that the deputies unlawfully deprived her of property and used excessive force in violation of the Fourth Amendment, as incorporated onto the states by the Fourteenth Amendment.  Specifically, Pena alleges that the deputies should not have forcibly entered her home and that the deputies wrongfully caused property damage through that entry and through other actions during the execution of the warrant.  Second, she alleges that the deputies used excessive force on her person by injuring her foot as they entered the home and fracturing her shoulder with a rifle when she tried to move.  The deputies argue that they are protected by federal qualified immunity.

#### A.    Qualified Immunity

Qualified immunity protects government officials from suit if they are "performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of qualified immunity is to protect government employees from the burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 525-26 (1985).  It balances the need to hold the government accountable with the need to shield officers from litigation distractions. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

6

Government employees performing discretionary functions are eligible for qualified immunity. *Harlow*, 457 U.S. at 818. A discretionary function is a job-related function that the employee accomplishes through legitimate means. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265–66 (11th Cir. 2004). The deputies were executing a facially valid search warrant when Pena was injured. Pena does not disagree that executing a search warrant is within the deputies' discretionary functions.

Thus, the burden is on Pena to show that the deputies are not entitled to qualified immunity. *Dalrymple v. Reno*, 334 F.3d 991, 995 (11th Cir. 2003) ("Once the government official has established that she was acting within her discretionary authority, the burden shifts to the plaintiffs to show that qualified immunity is not appropriate"). To meet her burden, Pena must show that (1) the official violated a constitutional right and (2) the constitutional right was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232, 242. A right is clearly established if an officer had "fair warning" that his conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002). There are three ways for a plaintiff to prove that a right is clearly established: "(1) case law with indistinguishable facts clearly establishing the constitutional right, (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional

right was clearly violated, even in the total absence of case law." *Lewis v. City of West Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (citations omitted).

### B.    Forcible Entry and Property Damage

Pena alleges that the deputies violated the Fourth Amendment when they forcibly entered her home. She also contends that the deputies unlawfully caused property damage in conducting the search. We agree with the district court that the deputies are entitled to qualified immunity on these claims.

Pena agrees that the deputies' entry was authorized and that they knocked and announced their presence, requesting permission to enter before ramming in the door. However, she claims that they should not have forcibly entered her home. Yet, there is no dispute that the deputies received no response from inside the home after having announced their presence and requesting entry. And Pena admitted in her deposition that at least 2–3 minutes elapsed between when she first saw the deputies and when they rammed her door.

Under the Fourth Amendment, police may forcibly enter a residence if there is an exigency. *United States v. Banks*, 540 U.S. 31, 40 (2003) ("[T]he exigent need of law enforcement trumps a resident's interest in avoiding all property damage."). Courts determine exigency by conducting a totality of the circumstances analysis based on the facts that the police knew at the time of the search. *Id.* at 39–41; *see generally United States v. Collins*, 510 F.3d 697 (7th Cir.

2007). Police must wait a reasonable amount of time before forcibly entering a home. *Banks*, 540 U.S. at 39–41. The amount of time that is reasonable depends on the exigency, not on how long it would take for an individual to open the door. *Id.* at 40. Depending on the situation, mere seconds between knocking and forcibly entering the house can be reasonable. *Id.* at 38–40 (holding that it was reasonable for police to wait 15–20 seconds when they were concerned that the defendant would destroy cocaine); *United States v. Crippen*, 371 F.3d 842, 846 (D.C. Cir. 2004) (holding that it was reasonable for police to wait 4 seconds when they believed that the defendant had a high-powered rocket launcher). Courts do not hold officers to a higher standard when their entry destroys property, but the need for and extent of property damage is relevant to determining the reasonableness of the entry. *Banks*, 540 U.S. at 41; *United States v. Ramirez*, 523 U.S. 65, 68 (1998).

It was reasonable for the deputies here to conclude that a forcible entry was necessary. They had obtained a warrant to search for drugs and guns and the warrant indicated that Daniel Santiago, a documented CRIPS gang member with an extensive arrest history, was an occupant of the residence. According to the deputies, they knocked 10 times on the front door, and received no response. Thereafter, an order was given to make an amplified announcement, and the

9

officers twice announced, "Police with a search warrant, open the door now." Again, they received no response.

Admittedly, Pena testified that she never heard a knock and did not hear the particular words uttered by the officer in his announcement, and we assume that to be true. But she agreed, as an undisputed fact, that the officers had announced their presence before entering, and she admitted in her deposition that she heard the officers make some muffled announcement through a megaphone prior to gaining entry. Clearly they were saying something. And she further testified that she thought 2–3 minutes had elapsed from the time she saw one of the deputies outside to the time she walked to the door.

These facts establish an exigent reason for a forcible entry to execute the search warrant. All the officers knew was that they had a search warrant and had received no response to their request for entry into a residence that might have been occupied by a member of the violent CRIPS gang. In hindsight, the deputies may not have needed to break down the door because Daniel Santiago, the putative gang member, was not present. Further, according to Pena, she was preparing to open the door simultaneous with the officers' entry. But the officers knew neither of those facts when they made their entry. *See Kesinger ex rel. Est. of Kesinger v. Herrington*, 381 F.3d 1243, 1248–49 (11th Cir. 2004) ("The 'reasonableness' inquiry . . . must be judged from the perspective of a reasonable officer on the

10

scene, rather than with the 20/20 vision of hindsight."). In short, we conclude that the forcible entry was reasonable under the circumstances.

Beyond the broken front door, Pena complains about damage to other property during the execution of the search. She alleges that she was deprived of property in violation of the Fourth Amendment because the deputies damaged her windows, walls, and interior doors. Under the Fourth Amendment, officers have discretion in executing a search warrant. *Dalia v. United States*, 441 U.S. 238, 257 (1979). They may not cause "excessive or unnecessary destruction of property," *Ramirez*, 523 U.S. at 71, but courts recognize that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia*, 441 U.S. at 258. *See also United States v. Andreu*, 715 F.2d 1497, 1499–1501 (11th Cir. 1983). To determine whether officers damaged property in violation of the Fourth Amendment, courts examine the reasonableness of the officers' actions. *Ramirez*, 523 U.S. at 71–72.

In this case, the property damage occurred as the deputies quickly entered the house and were attempting to expeditiously ensure that there were no persons within who could threaten their safety. As discussed above, the deputies believed that they were entering the home of a gang member who possessed firearms. This made it reasonable for the deputies to quickly enter and search the house, even though this unfortunately resulted in some damage to the property. *See Banks*, 540

U.S. at 37 ("police in exigent circumstances may damage premises so far as necessary for a no-knock entrance"); *Ramirez*, 523 U.S. at 70–72 (finding it reasonable for officers to break a window to utilize a flash-bang device).

But even if one were to conclude that the deputies acted unreasonably in making a forceful entry into the house and in causing the damage alleged by Pena, they would still be entitled to qualified immunity because Pena has failed to identify clearly established law that proscribes the deputies' specific conduct.   In short, we agree with the district court that Pena has failed to prove that the deputies violated her constitutional rights based on their entry into the home and on other property damage that occurred during the execution of the search warrant.

## C.    Excessive Force

Pena also claims that the deputies violated the Fourth Amendment by using excessive force on her as they entered the home.  As noted, Pena was standing behind the front door when the SWAT team forced it open.  In the process, Pena was knocked to the ground and her foot was fractured, either because an entering deputy stepped on it or because the door hit her foot as it was toppling down.  In addition, Pena claims that when she tried to stand up after the initial entry, a SWAT team member used his rifle to push her back to the ground and injured her shoulder.

12

Courts apply an objective reasonableness standard to determine whether an officer used excessive force in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989). Courts judge reasonableness "from the perspective of a reasonable officer on the scene" and must keep in mind that "police officers are often forced to make split-second judgments [ ] in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396–97. Even if the amount of force used was not necessary, the force is constitutional if it was reasonable. *Croom v. Balkwill*, 645 F.3d 1240, 1251–53 (11th Cir. 2011) ("Though we are skeptical that the force alleged was truly necessary under the circumstances, we cannot find a constitutional violation based on its usage.").

As to the injury to Pena's foot, this injury resulted from the breaking down of the door by the officers to gain entry into the house. Pena's foot was either struck by the falling door or by an entering officer who stepped on her foot as he was hastily coming through the door. There is no evidence that the deputies knew that Pena was standing behind the door or that they even intended to make contact with her. As to the force used by a deputy to keep Pena from standing, the district court noted that the record indicated that Pena was "forcefully poked" with a rifle only after "she turned her body in an attempt to stand after being told not to move." *See Michigan v. Summers*, 452 U.S. 692, 705 (1981) ("a warrant to search for contraband founded on probable cause implicitly carries with it the limited

13

authority to detain the occupants of the premises while a proper search is conducted") (footnote omitted); *Muehler v. Mena*, 544 U.S. 93, 98–100 (2005) ("Inherent in *Summers*' authorization to detain an occupant of the place to be searched is the authority to use reasonable force to effectuate the detention."). *Cf. Croom*, 645 F.3d at 1251–53 (although "skeptical that the force alleged was truly necessary," holding that officers did not use excessive force during the course of detaining a sixty-three year old occupant of a home being searched by pushing her to the ground and holding her there with a foot to her back for ten minutes).

But as with the property damage/forcible entry claim, even if one can debate, in retrospect, whether the officers acted reasonably in their physical contact with Pena, Pena has nonetheless not identified any clearly established law that would put the deputies on notice that their particular conduct constituted excessive force in violation of Pena's constitutional rights. Accordingly, we likewise affirm the district court's grant of qualified immunity on this claim.

## IV.   FLORIDA LAW CLAIMS

Pena further contends that the deputies' actions violated Florida law. She states five state law claims: assault, battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence. Florida government officials receive sovereign immunity under § 768.28. An officer cannot be held liable for acts committed in "the scope of her or his employment or

14

function" unless he "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28. Bad faith is defined as actual malice and willful and wanton conduct is "worse than gross negligence and more reprehensible and unacceptable than mere intentional conduct." *Kastritis v. City of Daytona Beach Shores*, 835 F. Supp. 2d 1200, 1225 (M.D. Fla. 2011) (citations and quotation omitted).

An officer acts within the scope of his employment if "(a) it is the type of conduct which the employee is hired to perform, (b) it occurs substantially within the time and space limits authorized or required by the work to be performed, (c) the conduct is activated at least in part by a purpose to serve the employer." *Craft v. John Sirounis and Sons, Inc.*, 575 So. 2d 795, 796 (Fla. Dist. Ct. App. 1991). Pena does not contest that the deputies were acting in the scope of their employment when they executed the search warrant. Thus, they are protected by Florida sovereign immunity unless their actions constitute bad faith under § 768.28. *See Kastritis*, 835 F. Supp. 2d at 1225.

### A.    Assault and Battery

In Florida, an assault is "an intentional, unlawful offer of corporal injury to another by force, or exertion of force directed toward another under such circumstances as to create a reasonable fear of imminent peril." *Sullivan v. Atl. Fed. Sav. & Loan Ass'n*, 454 So. 2d 52, 54 (Fla. Dist. Ct. App. 1984). A battery is

"the infliction of a harmful or offensive contact upon another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So. 2d 1061, 1063 (Fla. Dist. Ct. App. 2005). To determine whether an officer's actions are an assault and battery, courts inquire whether the officer's use of force was reasonable. *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. Dist. Ct. App. 1996) (applying the reasonableness standard to battery); *City of Fort Pierce v. Cooper*, 190 So. 2d 12, 14 (Fla. Dist. Ct. App. 1966) (applying the reasonableness standard to assault).

The reasonableness inquiry outlined in Section III applies here. As discussed above, it was reasonable for the deputies to forcibly enter the house, which action caused them to knock Pena down and hurt her foot, and to prevent Pena from standing at a time when the deputies had not safeguarded the premises. Thus, the deputies are not liable for assault and battery.

### B. Intentional Infliction of Emotional Distress

To make a claim for intentional infliction of emotional distress, a plaintiff must prove "(1) deliberate or reckless infliction of mental suffering; (2) outrageous conduct; (3) the conduct caused the emotional distress; and (4) the distress was severe." *Liberty Mut. Ins. Co. v. Steadman*, 968 So. 2d 592, 594 (Fla. Dist. Ct. App. 2007). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible

16

bounds of decency." *Metro. Life Ins. Co. v. McCarson*, 467 So. 2d 277, 278–79 (Fla. 1985). For the same reasons discussed above, the deputies' actions were not outrageous or extreme. The deputies are thus not liable for intentional infliction of emotional distress.

### C.    Negligent Infliction of Emotional Distress and Negligence

By its own terms, § 768.28 protects officers from negligence-based claims. That is, Florida officers have sovereign immunity unless their actions are "worse than gross negligence." *Kastritis*, 835 F. Supp. 2d at 1225 (quotation omitted). It is thus not possible for the deputies to be held liable for negligent infliction of emotional distress or negligence. *See Sanders*, 672 So. 2d at 48 ("it is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of an 'intentional' tort.").

### CONCLUSION

We agree with the district court that the deputies are protected by federal qualified immunity and Florida sovereign immunity. This court therefore **AFFIRMS** the district court's grant of summary judgment.

17